THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* SAMUEL T. WARFIELD, Plaintiff in Error.

*Opinion filed December 17, 1913—Rehearing denied Feb. 5, 1914.*

1. CRIMINAL LAW—*when State's attorney cannot be required to elect as between different counts.* A count for conspiring to obtain money and property by false pretenses is properly joined with a count for conspiring to obtain the same money and property by means of the confidence game where both offenses consist of the same transaction, and in such case the State's attorney can not be required to elect as to which count he will rely upon.

2. SAME—*count for conspiring to obtain money or property by false pretenses need not allege intent to defraud.* Section 46 of division 1 of the Criminal Code, concerning conspiracy to obtain money or property by false pretenses, is not merely declaratory of the common law offense, which required an allegation of an intent to cheat and defraud, but refers to section 96 of the Criminal Code, which makes the obtaining of money or property by false pretenses a misdemeanor, and hence a count charging a conspiracy to obtain money or property by false pretenses need not allege an intent to cheat and defraud.

3. SAME—*when indictment need not allege elements of offense the accused is charged with conspiring to commit.* Where a statute making it a crime to conspire to commit a misdemeanor designates the misdemeanor by its common and popular name, without describing all the elements necessary to constitute the misdemeanor, an indictment charging such conspiracy need not allege the elements necessary to constitute the misdemeanor, but it is sufficient to describe it by the designation used in the conspiracy statute.

4. SAME—*when use of word "funds" adds nothing to the indictment.* Section 46 of division 1 of the Criminal Code, concerning the offense of conspiring to obtain money or property by false pretenses, does not use the word "funds," and hence the use of such word in an indictment charging a conspiracy to obtain "funds, money and property by false pretenses" is without effect.

5. SAME—*what is not a conspiracy to obtain money or property.* Neither a contract in the form of an order for books, nor promissory notes, are money, nor in the hands of the maker are they property, and persons who enter into a scheme to obtain such contract and notes cannot be convicted of a conspiracy to obtain money or property by false pretenses, under section 46 of division 1 of the Criminal Code.

6. SAME—*what is a conspiracy to obtain money.* If a part of the scheme entered into by two or more persons includes the obtaining of money by falsely representing that it was needed by such persons for expenses connected with the transaction, they are guilty of conspiracy to obtain money by false pretenses even though they did not carry out the conspiracy as originally planned, as the offense of conspiracy is complete when it is entered into.

7. SAME—*when a check in hands of maker is not property.* A check made payable to the order of a certain person is not property while in the hands of the maker, but is in the same class as promissory notes. (*Lory* v. *People,* 229 Ill. 268, followed.)

8. SAME—*when a conspiracy is not merged in felony.* A conspiracy to obtain money and property by false pretenses cannot be said to be merged in the felony contemplated by the conspiracy, where the proof shows that the conspirators did not obtain the money and property of the victim but obtained checks, notes and a contract.

9. SAME—*statute is indefinite as to what constitutes confidence game.* The statute is indefinite as to what constitutes the confidence game, and in some cases the same state of facts will constitute a conspiracy to obtain money and property by means of false pretenses and also to obtain the same money by means and use of the confidence game, and will support an indictment containing counts charging each of such offenses.

10. SAME—*when evidence of previous fraud is not admissible.* Where an indictment charges a conspiracy to obtain money or property by means of false pretenses, a co-conspirator, who has turned State's evidence, may detail his conversation with the accused which he claims induced the accused to enter the conspiracy, even though such recital covers other frauds and conspiracies with which the accused had no connection; but it is error to permit evidence to be introduced for the purpose of showing that such other frauds and conspiracies had, in fact, been committed.

11. SAME—*when checks, contract and promissory notes are admissible.* If a part of an alleged conspiracy is to obtain money by false pretenses, the checks upon which the money was obtained are admissible in evidence; and a contract and promissory notes, obtained at the same time, are also admissible as evidence of acts accomplished in the common design to obtain the money.

12. SAME—*what is undue restriction in a cross-examination.* Where the name of a female witness is not indorsed on the back of the indictment, and the notice to the accused that she would be called as a witness by the People does not disclose the fact that she is a married woman, it is error for the court to refuse to allow

the accused to cross-examine the witness concerning her husband, for the purpose of disclosing the relations, if any, which he has with the persons interested in the prosecution.

13. SAME—*evidence that a third person not connected with the case has fled the jurisdiction of the court is not proper.* In a trial for conspiracy to obtain money and property, the fact that a third person, who had been involved in deals with the same victim but who had no connection with the transaction forming the basis of the charge against the accused, has fled the jurisdiction of the court is not proper evidence against the accused.

14. SAME—*when fact that the accused has traveled under an assumed name should not be proved.* The fact that the accused has traveled under an assumed name should not be allowed to be proved, where such fact has no connection with the offense charged and no tendency whatever to prove its commission.

15. SAME—*conspiracy statute does not include obtaining of signature to written instrument.* In a trial for conspiracy to obtain money or property by false pretenses it is error to give an instruction stating that one who, with intent to cheat and defraud, obtains the signature of another to any written instrument is guilty of obtaining funds, money and property by false pretenses, as the conspiracy statute does not cover the obtaining of a signature to a written instrument.

16. SAME—*when instruction on the presumption of innocence is not erroneous.* An instruction for the People which fairly states the law with reference to the presumption of innocence is not erroneous because it uses the word "unless" instead of "until" in the first paragraph of the instruction reading, "Everyone accused of crime is by law presumed to be innocent *unless* the contrary is by the evidence proved to be true beyond a reasonable doubt."

CARTER, J., dissenting.

WRIT OF ERROR to the Branch "C" Appellate Court for the First District;—heard in that court on writ of error to the Criminal Court of Cook county; the Hon. WILLIAM H. McSURELY, Judge, presiding.

WILLIAM S. FORREST, and B. C. BACHRACH, for plaintiff in error.

P. J. LUCEY, Attorney General, MACLAY HOYNE, State's Attorney, and GEORGE P. RAMSEY, (GEORGE M. POPHAM, and ZACH HOFHEIMER, of counsel,) for the People.

Mr. CHIEF JUSTICE COOKE delivered the opinion of the court:

Samuel T. Warfield, the plaintiff in error, was, upon a trial before a jury in the criminal court of Cook county, found guilty of conspiracy, and his punishment was fixed by the verdict at imprisonment in the penitentiary for the term of three years and to pay a fine of $2000. After overruling motions for a new trial and in arrest of judgment the court sentenced the plaintiff in error to the penitentiary for an indeterminate period and to pay a fine of $2000 and costs. A writ of error was sued out of the Appellate Court for the First District and the cause was assigned to Branch "C" of that court for hearing and determination. The Appellate Court found that the only error committed by the criminal court was in sentencing plaintiff in error to the penitentiary for an indeterminate period instead of the period of three years fixed by the verdict of the jury, and reversed the judgment and remanded the cause to the criminal court, with directions to enter a judgment upon the verdict sentencing plaintiff in error to imprisonment in the penitentiary for the term of three years and to pay a fine of $2000. Plaintiff in error has sued out this writ of error to reverse the judgment of the Appellate Court.

Plaintiff in error was indicted together with John M. MacFarland and William N. Cooper. MacFarland became a witness for the People against his co-defendants and was not prosecuted under this indictment, and Cooper was found not guilty by the verdict of the jury.

The indictment, which was returned at the September, 1908, term of the criminal court, consisted of four counts. The first charged that the three defendants above named, on April 30, 1908, in Cook county, "unlawfully, willfully and feloniously, with the fraudulent and malicious intent to wrongfully and wickedly obtain money from one Amanda L. Patten by means of false pretenses, did conspire, com-

bine, confederate and agree together with each other and with divers other persons whose names are to the jury unknown, to then and there unlawfully and fraudulently obtain from the said Amanda L. Patten a large amount of funds, money and property, to-wit, funds, money and property of the value of $22,710, the property of the said Amanda L. Patten, by means of false pretenses," etc. The second count charged that the same persons, on April 30, 1908, in Cook county, "unlawfully, willfully and feloniously, with the fraudulent and malicious intent to wrongfully and wickedly commit a certain felony, to-wit, to obtain money from one Amanda L. Patten by means and by use of the confidence game, did then and there conspire, combine, confederate and agree together with each other and with divers other persons whose names are to the jury unknown, to then and there unlawfully and feloniously obtain from the said Amanda L. Patten a large amount of funds, money and property, to-wit, funds, money and property of the value and to the amount of $22,710, the property of the said Amanda L. Patten, by means and use of the confidence game," etc. The third count charged that the same persons did unlawfully and feloniously obtain from Amanda L. Patten funds, money and property of the value of $22,710, the property of Amanda L. Patten, by means and by use of the confidence game. The fourth count charged that the same persons unlawfully and feloniously did obtain from Amanda L. Patten one check of the value of $60, one check of the value of $350, one promissory note of the value of $1300, and twenty-one notes, each of the value of $1000, all being the property of Amanda L. Patten, by means and by use of the confidence game.

At the close of all the evidence the prosecution, at the suggestion of the court, elected not to proceed to the jury on the charges made in the third and fourth counts, but to proceed to the jury against the defendants upon the charges of conspiracy made in the first and second counts of the

indictment. Thereupon the defendants moved the court to require the State to elect between the first and second counts. The motion was overruled, and this action of the court is complained of. It is urged that the offenses charged in these two counts, viz., a conspiracy to obtain funds, money and property by false pretenses, and a conspiracy to obtain the same funds, money and property by means and by use of the confidence game, are repugnant, and that the repugnancy lies in the means by which the conspiracies therein charged were to be accomplished. This same question was raised in *People* v. *Weil,* 243 Ill. 208, where the defendant was tried under 'an indictment containing two counts,—one for obtaining money by false pretenses and the other for obtaining the same money by means of the confidence game. There, as here, the trial court declined to require the prosecution to elect 'upon which count conviction would be asked, and we there said: "If two or more offenses are properly joined in an indictment under separate counts and grow out of the same transaction, the State's attorney will not be required to make an election for which offense charged in the indictment he will ask a conviction. The right to require the State's attorney to elect for which offense he will ask the jury to convict, when more than one offense is charged in different counts of an indictment, is confined to cases where the offenses charged in the different counts of the indictment are actually distinct from each other and do not arise out of the same transaction.—*Goodhue* v. *People,* 94 Ill. 37; *Andrews* v. *People,* 117 id. 195; *Herman* v. *People,* 131 id. 594." The same rule applies to an indictment for conspiracies to commit these offenses provided they grow out of the same transaction, as in the case at bar. It was not sought to prove two separate and distinct transactions. The court did not err in this particular.

The motion in arrest of judgment was properly overruled. Under that motion the sufficiency of the second

count was not questioned but the same question was sought to be raised as was raised by the motion to elect, it being contended that the verdict is insufficient for uncertainty and repugnancy, and, in addition, the sufficiency of the first count is questioned. The criticism made of the first count is, that it contains no averment of an intent to cheat and defraud Mrs. Patten of her money and property. If this averment is necessary the count is bad.

Section 46 of the Criminal Code, upon which this indictment is based, reads, in part, as follows: "If any two or more persons conspire or agree together * * * to obtain money or other property by false pretenses * * * or to commit any felony, they shall be deemed guilty of a conspiracy; and every such offender * * * shall be imprisoned in the penitentiary not exceeding five years, or fined not exceeding $2000, or both."

Plaintiff in error contends that a conspiracy to obtain money or property by false pretenses was an offense at the common law, in an indictment for which it was necessary to allege an intent to cheat and defraud, and as our statute declares this offense without defining it and simply by using its common law name, leaving the definition of the offense to the common law, the indictment must follow the common law procedure and allege an intent to cheat and defraud as one of the elements of the crime. We do not concur with counsel that our conspiracy statute is, in this respect, simply declaratory of the common law. At the common law cheating was a crime, and it was necessary to allege and prove, in a prosecution for this offense, an intent to cheat and defraud. To obtain money or property by false pretenses was one means of cheating and was punishable as such. A conspiracy to cheat was also an offense at the common law, and it necessarily included any means by which cheating could be accomplished, among which was obtaining money or property by false pretenses. By section 96 of our Criminal Code the obtaining of money or

property by false pretenses is made a misdemeanor, and it is clear that the conspiracy statute refers to this misdemeanor and is not intended to be merely declaratory of the common law.

It will be noted that said section 46, as above quoted, makes it a crime for two or more persons to conspire to commit any felony, and we have held that an indictment for a conspiracy to commit a felony need not allege a criminal intent to commit such felony, the intent to commit the felony being no part of the description of the crime charged in the indictment. (*People* v. *Poindexter,* 243 Ill. 68.) In an indictment for conspiracy to commit a felony it is only necessary to designate the felony intended to be committed by such description as will apprise the defendants of the exact charge upon which they will be tried, and it is not required that the felony be described with the same accuracy as would be required in an indictment for the felony itself. So, where a statute, in making it a crime to conspire to commit a certain misdemeanor, designates the misdemeanor by its common or popular name, without describing all the elements necessary to constitute the misdemeanor, an indictment charging such conspiracy need not allege all the elements necessary to constitute the misdemeanor contemplated by the conspiracy. It is sufficient if it describes the misdemeanor by the same designation employed in the statute fixing the punishment for the conspiracy. A conspiracy to obtain money or property by false pretenses is a conspiracy to commit a misdemeanor, as the term, "to obtain money by false pretenses," is the common and well understood designation of a misdemeanor for the commission of which a punishment is fixed by our statute. We perceive no reason why in an indictment for conspiracy to commit this misdemeanor the intent should be alleged any more than in an indictment for a conspiracy to commit a felony. The crime is as complete when the conspiracy is formed for the purpose of committing this misdemeanor

as it is when a conspiracy is formed for the purpose of committing a felony.

MacFarland, who was indicted with plaintiff in error and Cooper, was the principal witness for the People. He testified to a series of transactions which he had had with Mrs. Patten, including the one upon which the indictment in this case was based. He and Warfield and Cooper were subscription book agents, and had for some time been engaged in soliciting orders for expensive art and *de luxe* editions of various books, which orders were sold to book publishers and dealers. MacFarland, alone, of these three persons had personally dealt with Mrs. Patten. He had sold her ordinary books at usual prices during a period covering two or three years immediately preceding the fraudulent transactions hereinafter mentioned. He testified that the first fraud perpetrated upon Mrs. Patten by him was in September, 1907, when, at the instigation of a book agent named Rosenfield, who outlined to him the fraudulent scheme, he, accompanied by another book agent named Drew, called upon Mrs. Patten at her home in Evanston and obtained her signature to an order for two sets of *de luxe* editions, viz., the British Poets and Scott's works, by falsely representing to her that he had been given an option by R. G. Newbegin, a book publisher in New York City, to purchase those books for $5200 and that the option would expire in a few days; that he had an order from a banker named Ladd, who lived in Portland, Oregon, to obtain those books for him at a price three times that at which he could purchase them under the option from Newbegin, but that Ladd was then in Japan or on his way home from Japan and would not reach home until after the option had expired, and that if Mrs. Patten would accommodate him by signing the order, addressed to Newbegin, for the books at a price of $5200, payable in monthly installments of $260, it would enable him to make a large sum of money, with which he could start in business for

himself; that Ladd would return and carry out his con-·
tract with MacFarland before any of the payments would
fall due under the terms of the order to be signed by Mrs.
Patten; that it would probably not be necessary to deliver
the books to her, and that she would not be required to
make any of the payments, as he would pay Newbegin out
of the proceeds of the sale to Ladd, and that the profits
to be made out of the transaction would be divided among
MacFarland, Drew and Mrs. Patten. He further testified
that Mrs. Patten said that she would not want any of the
profits—that if there were any profits she would be glad
for MacFarland to have them himself. He also testified
that he did not have any option from Newbegin to pur-
chase these books; that he did not have any order for them
from Ladd or from anyone else; that Ladd was a ficti-
tious person; that he agreed with her that if Ladd should
for any reason not take the books and pay for them he
would take them off her hands and see that the contract
was not enforced by Newbegin, but that he had no inten-
tion of keeping this agreement, and that he intended to
cheat and defraud her out of $5200. The order which
Mrs. Patten signed on this occasion was never sent to New-
begin, but, instead, MacFarland gave it to a book agent
named Praeger, with whom he was on intimate terms, and
in some manner it afterwards reached the hands of Rosen-
field, who in November, 1907, called upon Mrs. Patten at
her home, informed her that the books were ready for de-
livery through the Irving Squire Company, of Chicago, and
asked her if· she would then make the first payment and
make the check payable to the Irving Squire Company.
Mrs. Patten gave Rosenfield a check for $260, as requested,
and shortly afterwards, on the same day, he returned and
asked her whether she had any objection to transferring
the order from Newbegin to Albert Miller Adams, a Chi-
cago book dealer from whom Mrs. Patten had previously
purchased books. She consented to the transfer of the

order and gave Rosenfield a check for $300, payable to
Adams, in lieu of the check to the Irving Squire Company,
which she then destroyed.  On neither of these occasions
did she inform Rosenfield of the circumstances under which
she had signed the order which MacFarland had obtained
from her or advise him that the order was other than what
it purported to be, giving as a reason therefor, when called
by the People as a witness in this case, that she thought it
might interfere with MacFarland's arrangements for the
sale to Ladd if she informed Rosenfield of the circum-
stances under which she had signed the order.  Soon after-
wards Rosenfield sent MacFarland, who was then in New
York City, a check for $320 for his services in obtaining
the order from Mrs. Patten.

MacFarland further testified that during the latter part
of November, 1907, he met Adams in the office of the
Irving Squire Company, in Chicago, and that Adams of-
fered him $150 if he would induce Mrs. Patten to exchange
the order for the British Poets and Scott's works for an
order for some set of books which he (Adams) had in
stock; that on November 22, 1907, he went to Evanston,
to ascertain Mrs. Patten's attitude towards him, in order to
determine whether there was any possibility of effecting a
change in the order for Adams; that on this occasion he
told her that he had been east and had been unable to com-
plete the sale of the British Poets and Scott's works to
Ladd; that Ladd had had some financial troubles, and that
he wanted to go to Portland to see Ladd personally and
consummate the sale but that he had no money with which
to pay the expenses of the trip, and that he asked her for
$150 expense money; that Mrs. Patten thereupon gave him
a check for $150, which he cashed at a bank in Evanston;
that he did not then have any intention of going to Port-
land but intended to cheat her out of $150; that he did not
go to Portland but went to Chicago instead; that he had
theretofore informed Adams of the circumstances under

which he had obtained the order from Mrs. Patten; that, considering the fact that she had given him $150 was an indication that Mrs. Patten still felt kindly towards him, he agreed with Adams to make an effort to obtain the change in the order; that, accompanied by Adams, he went to Evanston, and that Adams waited at the depot while he went to the home of Mrs. Patten; that Adams suggested to him the fraudulent scheme which he carried out upon this occasion, and promised to pay him, in addition to the $150 which he had at first offered, a commission of twenty-five per cent on the difference between $5200 and $8800 if he would obtain an order from Mrs. Patten for a *de luxe* edition of Hallowell's Shakespeare at the price of $8800; that on this occasion he falsely told Mrs. Patten that he had started for Portland when he had obtained the $150 check from her, and had gotten as far as Minneapolis when he received a telegram from Ladd stating that on account of financial troubles he would not take the British Poets and Scott's works, but that if she would exchange the order for those books for an order for a set of Hallowell's Shakespeare, at a price of $8800, he could easily dispose of the latter set at a much larger profit than he could obtain for the other two sets, as Ladd would not take them; that he had a customer in New York City who was very anxious to get this set of Shakespeare, and that he (MacFarland) could probably get $20,000 for it; that after she had received the books he would take them immediately to New York City and sell them there, pay Adams the amount due him, and if she did not want the profits he would keep them himself; that it would take two or three weeks to consummate the sale in New York City, but that by this means she could get rid of her contract with Adams, who was pressing her for payments on the other contract. Relying upon these representations made by MacFarland, Mrs. Patten signed an order, addressed to Albert Miller Adams, for a set of Hallowell's Shakespeare, agreeing therein to make

monthly payments of $500 until the full sum of $8800 had been paid, and MacFarland tore up the previous order which she had signed for the British Poets and Scott's works. Afterwards, on the same day, MacFarland again returned to Mrs. Patten's home and told her it would be necessary for her to then make a payment upon the second contract, and she thereupon gave him a check for $450, which MacFarland retained to apply on his commissions for obtaining the order. This payment, together with all payments which Mrs. Patten had made upon the former order, was credited upon the order for Hallowell's Shakespeare. MacFarland testified that he did not at that time have a prospective purchaser for Hallowell's Shakespeare in New York City or elsewhere. He further testified that thereafter, on December 23, 1907, he again called upon Mrs. Patten and falsely represented to her that he was ready to go to New York for the purpose of selling Hallowell's Shakespeare but would need some expense money for the trip, and asked her for $100; that thereupon Mrs. Patten gave him a check for $85 to defray the expenses of his proposed trip, which he cashed at a bank in Chicago; that he did not go to New York City, as he did not have a customer there for this set of books. The evidence shows that these books were delivered to Mrs. Patten at her home in Evanston in December, 1907, and were placed in the basement, unopened, and there remained until the first of May, 1908. Thereafter, up to the time she informed her husband of all the transactions, as hereinafter mentioned, Mrs. Patten made various payments to Adams upon the order for Hallowell's Shakespeare, which, together with the payments theretofore made by her and credited upon that order, aggregated $2650.

After having had the transactions with Mrs. Patten above mentioned, MacFarland became acquainted with the plaintiff in error, Warfield, and about March 1, 1908, they became associates in soliciting orders for books and selling

the orders to book publishers and dealers and divided the commissions or profits. During the months of March and April and the first part of May, 1908, they had their headquarters at the Auditorium Annex Hotel, in Chicago, where they occupied a suite of rooms. MacFarland testified that during the latter part of April, 1908, in these rooms, he detailed to Warfield all of his transactions with Mrs. Patten, as above set out, and the fraudulent methods by which he had obtained from her the orders for books and the checks above mentioned; that Warfield soon afterwards proposed a scheme by which they could obtain an order for more books from her and make a large profit, and that this scheme so proposed by Warfield was the one which was used by MacFarland in obtaining the order hereinafter mentioned; that on the following day, April 30, Warfield dictated to Maxine Fay, a stenographer at the Auditorium Annex, a fictitious order purporting to be written by a man named Emerson; that it was dated April 26, 1908, purported to have been written from Baltimore, Maryland, was addressed to MacFarland at the Auditorium Annex, and purported to be an order for four sets of books, viz., Dickens, Scott, Balzac and another set which MacFarland could not recall, at a price which was either $40,000 or $50,000,—MacFarland did not remember which; that the purported order called for a delivery of the books within ten days and promised a large payment upon delivery and the balance within thirty days; that Warfield signed the name "Emerson," with certain initials preceding this name which the witness did not remember, to this order and delivered the fictitious order to MacFarland to use in carrying out the scheme which he had previously outlined to MacFarland; that MacFarland, accompanied by Warfield, went to Evanston, and Warfield remained at the depot while he went to the home of Mrs. Patten; that he professed to her to be extremely sorry that he had involved her in the Adams contract and was unable to make a sale of Hallowell's

Shakespeare, but told her that he had a method by which he could get her out of all the troubles in which he had involved her; that there was no chance of failure because he had a written order from Mr. Emerson, a wealthy bromo seltzer manufacturer of Baltimore, for four sets of books at a price of either $40,000 or $50,000, (the witness not remembering which of these amounts he stated to her,) and that he showed her the fictitious order to which Warfield had signed the name of Emerson; that he further told her that he had an option on those books from the Keller-Farmer Company, of New York, under which he could purchase them for $22,300, and that if she would sign an order addressed to the Keller-Farmer Company, purchasing the books for $22,300, he would secure them from that company upon her order and take them to Baltimore for delivery to Emerson, collect the $40,000 or $50,000 from him, pay the Keller-Farmer Company the $22,300 and bring the balance back to Mrs. Patten so that she could pay Adams the balance due upon his contract; that Mrs. Patten said she did not want to get in any deeper, but that he replied that since she had gone thus far she might as well place herself in his hands; that she replied that she had gone so far that she was entirely in his hands, and that if he did not extricate her from her difficulties she would have to tell her husband all about the transactions; that he responded that it would not be necessary to tell her husband, because he (MacFarland) would complete the sale to Emerson within ten days and she could then settle with Adams. Thereupon Mrs. Patten signed an order addressed to the Keller-Farmer Company, of New York City, and directing that company to purchase and bind for her the following sets of books: Dickens, Scott, Thackeray and Balzac, agreeing to pay therefor $1000 per month until the full sum of $22,300 had been paid. On this occasion MacFarland also obtained from Mrs. Patten a check for $60 upon his representation that he needed the money to defray

the expenses of his contemplated trip to New York and Baltimore to consummate the sale of the books to Emerson, and testified that he cashed the check immediately at the bank in Evanston upon which it was drawn and gave one-half of this amount to Warfield. He testified that after cashing the check he returned to the depot where Warfield was waiting for him and informed Warfield of his conversation with Mrs. Patten and of the result; that while on the train returning to Chicago Warfield tore up the fictitious order purporting to be signed by Emerson; that after returning to Chicago Warfield informed him that he could not sell that order to any book publisher or dealer unless it was accompanied by notes signed by Mrs. Patten for the payments specified in the order, and requested MacFarland to return to Evanston the following day and induce Mrs. Patten to sign the notes; that, as requested by Warfield, he went to Evanston the following day and told Mrs. Patten that the Keller-Farmer Company would not accept the order unless it was accompanied by promissory notes signed by her for the payments specified in the order, and that if she would make the notes payable to his order he would not endorse them until the proper time and would not permit them to be negotiated. Thereupon Mrs. Patten signed twenty-two promissory notes which had been previously filled out by MacFarland. These notes were payable to the order of MacFarland. One was for the principal sum of $1300 and the others for $1000 each, and were payable, respectively, at monthly intervals. On this occasion MacFarland asked for additional money to defray the expenses of his trip to New York and Baltimore and received from Mrs. Patten a check for $350 for that purpose, which he immediately cashed at the bank in Evanston. He testified that he divided this money with Warfield. On the following day MacFarland and Warfield left for New York City. Shortly after their arrival in New York they called upon Cooper (the defendant who was acquitted by the verdict of

the jury in this case) at his home in Brooklyn and told him
that they had an order for over $20,000 worth of books.
MacFarland testified that upon being informed that a Kel-
ler-Farmer Company blank had been used in taking the
order, Cooper advised them to strike out the name of that
company and to insert in lieu thereof Newbegin's name,
because Newbegin would pay more for the order than the
Keller-Farmer Company. On the following morning New-
begin called upon Warfield and MacFarland at the hotel at
which they had registered and agreed to pay them a com-
mission of thirty per cent for the order. MacFarland tes-
tified that on this occasion he informed Newbegin that the
sale to Mrs. Patten had been upon the investment scheme;
that the order and notes had been fraudulently obtained
from her, and that some new scheme would have to be
devised to lead Mrs. Patten to believe that there was a de-
lay of some kind in carrying out the sale to Emerson and
that she would have to receive the books. He further tes-
tified that while they were talking to Newbegin, Warfield
privately asked the witness to change the order by striking
out the name of the Keller-Farmer Company and insert-
ing in lieu thereof the name of R. G. Newbegin, which he
(MacFarland) accordingly did; that he then endorsed the
twenty-two notes which he had received from Mrs. Patten
and delivered them, together with the order, to Newbegin,
who paid him and Warfield $1000 each and agreed to pay
them the balance of their commission of thirty per cent as
soon as the first note was paid. MacFarland further tes-
tified that after receiving the money from Newbegin and
after arranging to meet in New York City on the following
Saturday, Warfield went to his home in Philadelphia to
spend the intervening time with his family and he (Mac-
Farland) went to Boston. On the following Sunday, War-
field, MacFarland and Cooper left for Chicago, arriving
there Monday morning. Newbegin had arranged to ship
the books to MacFarland at Chicago by express for deliv-

ery to Mrs. Patten on the following Wednesday. Upon their arrival in Chicago, Warfield, MacFarland and Cooper went to the suite of rooms at the Auditorium Annex occupied by Warfield and MacFarland, and Cooper stayed in MacFarland's room that night, the latter spending the night elsewhere. In the meantime, Adams in some manner had been advised that MacFarland had obtained another order from Mrs. Patten and notes aggregating $22,300, and two or three days after the order and notes were signed he called her over the telephone and asked her if she had seen MacFarland. Upon being informed by her that MacFarland had been to Evanston to see her, Adams, according to the testimony of Mrs. Patten, said: "I hear he has some notes of yours which he is showing about the street, and I want to notify you that if there is any lawsuit or anything connected with it I don't want to be in it. My account against you is good, and I want to give you notice that if there is any losses going to follow I want to be secured in my claim." Immediately after this conversation with Adams Mrs. Patten told her husband about all the transactions which she had had with MacFarland.

On the day following the arrival of Warfield, MacFarland and Cooper in Chicago, Mr. Patten, accompanied by Joseph E. Paden, an attorney, and by a detective, called at the rooms occupied by Warfield and MacFarland at the Auditorium Annex. Warfield was not at the hotel at that time but both MacFarland and Cooper were in the rooms. Neither MacFarland nor Cooper knew any of the callers. Upon being admitted Paden asked if MacFarland was there, and MacFarland answered, "No, he is out in the park." According to the testimony of MacFarland, Paden then turned to Cooper and asked him if he was MacFarland, and Cooper responded that he was not; that Paden then asked when MacFarland would return, and that he (MacFarland) replied, "That is Mr. Cooper over there; he may be able to tell you more about it than I can;" that Paden

then asked Cooper if he knew when MacFarland would return, and that Cooper responded, "Usually about five o'clock," and that thereupon the callers left, Paden remarking, while leaving, that he would return at five o'clock; that he (MacFarland) followed them into the hall for the purpose of ascertaining their names, but that all he could learn was that one of them was Joseph E. Paden, an attorney; that he then returned to the room and told Cooper that he thought that was Mr. Patten, and that Cooper told him he "had better duck" until he found out what they wanted; that he escaped from the hotel by means of the freight elevator and went to a cafe a short distance from the hotel and telephoned Cooper asking him to come to the cafe, and that he did not thereafter see or hear from Cooper until the trial of this cause; that he waited a considerable time in the cafe for Cooper and then boarded a street car and went to the Lexington Hotel, where he remained but a short time and then went to call upon some friends at Thirty-fifth street and Michigan avenue; that about seven o'clock that evening he telephoned Warfield and asked him what the trouble was, and that Warfield replied that Patten, Paden and a Pinkerton detective were at the hotel and that he would see them and force them to a settlement, and requested MacFarland to come to the hotel that night at eight o'clock; that he (MacFarland) replied that he would not go to the hotel until he found out just what to expect and what they were going to do; that later, the same night, Warfield met him by appointment and informed him that Paden wanted to see him personally and would not deal with anyone else, and asked him if he would not go to Paden's office at ten o'clock the following morning; that Warfield also told him that he thought they had a warrant for him; that he (MacFarland) refused to go; that on the following Thursday Warfield met him again and had a conversation with him in the presence of Ella McClelland; that Warfield on this occasion told him that a warrant had

been issued for him and that Patten had offered a reward of $1000 for his arrest, and that Warfield advised him to keep in hiding for awhile; that he met Warfield again about two weeks later at a house where he (MacFarland) had remained in hiding, and that on this occasion. Warfield advised him to go to Canada and informed him that he had a railroad ticket for him to Detroit, Michigan; that the witness packed his grip, and, accompanied by Warfield, went to the depot; that Warfield gave him the railroad ticket, and that he (MacFarland) went to Detroit and then proceeded to Toronto, Canada, where he was later arrested and taken back to Chicago. Upon his arrival in Chicago, he, at the suggestion of Joseph E. Paden, made a detailed written statement of all his transactions with Mrs. Patten, and afterwards appeared before the grand jury which returned the indictment in this case.

Mrs. Patten testified on behalf of the People. Her testimony consisted chiefly in corroborating MacFarland with reference to the transactions which she had had with him. She detailed the various conversations which she had had with MacFarland and the representations which he had made to her to induce her to sign the various orders for books and the notes and checks mentioned by MacFarland in his testimony. She had never had any personal dealings with Warfield, and her testimony does not implicate him, or any other person except MacFarland, in any of the frauds which were practiced upon her by MacFarland.

Warfield, as a witness in his own behalf, denied that MacFarland had ever informed him of any of the frauds which he had perpetrated upon Mrs. Patten, and denied that he had in any other manner obtained any knowledge of them until about the middle of May, 1908, when certain articles appeared in the Chicago papers purporting to give an account of them. He testified that his first conversation with MacFarland about selling books to Mrs. Patten occurred on April 29, 1908, when MacFarland remarked to

him that he thought he had a party to whom they could sell
some books; that he inquired who the party was, and that
MacFarland replied that it was Mrs. Patten, of Evanston;
that he remarked that he had never known of her buying
expensive books, and that MacFarland said that he had
sold her a set of Shakespeare for $8000 but had been keep-
ing that fact to himself; that she was one of his best cus-
tomers; that MacFarland then proposed to take him out to
Evanston and introduce him to Mrs. Patten; that on the
morning of April 30, 1908, he accompanied MacFarland to
Evanston and proceeded to the Patten home; that just as
they reached the gate MacFarland suggested that it would
be better for him to go in first and make an appointment
for a time later in the day, as Mrs. Patten did not like for
him to bring anyone with him; that MacFarland then en-
tered the house and he (Warfield) returned to the depot,
where he waited for MacFarland; that in about an hour
MacFarland returned to the depot and produced the order,
signed by Mrs. Patten, for $22,300 worth of books; that
he asked MacFarland whether he had received any pay-
ment on the contract, and upon being informed that he had
not, told him that he could not dispose of an order for such
a large amount unless he obtained a substantial payment in
advance or notes evidencing the payments to be made upon
the contract; that he also asked MacFarland why he had
taken the order on a Keller-Farmer Company blank form,
as that company did not have the books mentioned in the
order but that Newbegin did have those books; that Mac-
Farland said that Mrs. Patten had no ready cash and that
he did not think she would sign notes; that the witness
then proposed to accompany MacFarland to Evanston the
following day and explain to Mrs. Patten the reason why
it would be necessary to make a substantial payment or
give notes in order to get the books for her; that Mac-
Farland agreed to this proposition and proceeded to fill out
twenty-two promissory notes, one for $1300 and the others

for $1000 each, leaving the name of the payee blank; that
on the following morning they started for Evanston; that
while on the train MacFarland said that as Mrs. Patten did
not like' for him to take anyone with him to her home he
thought it would be advisable for him to go to the house
alone, and that if she would sign the notes at all she would
sign them as readily for him as she would for Warfield;
that he acquiesced in this arrangement but expressed his
regret that MacFarland had not told him that before they
started, as he could have attended to some business in Chi-
cago; that he cautioned MacFarland to have the order
changed from Keller-Farmer Company to Newbegin in case
he obtained her signature to the notes; that upon their
arrival in Evanston he remained at the depot while Mac-
Farland went to the home of Mrs. Patten; that MacFar-
land returned to the depot in about an hour and informed
the plaintiff in error that Mrs. Patten had signed the notes
and had also given him a check for $250, which he had
cashed at the bank; that the witness then asked MacFar-
land whether he had changed the order, and that MacFar-
land replied that he had not,—that he had forgotten about
that change; that he then asked MacFarland the name of
the payee in the notes, and that MacFarland replied that he
had made them payable to his order; that upon learning
this he (Warfield) did not consider it necessary to obtain
Mrs. Patten's consent to a change in the order; that when
they returned to Chicago MacFarland gave him $125, which
was to be applied on the commissions which they expected
to obtain for the order and to be credited as a payment
upon the contract by Mrs. Patten; that Warfield then pro-
posed that they go to New York and dispose of the order
to Newbegin at once, and that on the following day they
started for New York; that upon their arrival in New
York on Monday morning he telephoned to Cooper and ar-
ranged to call upon him at his home in Brooklyn that after-
noon; that shortly after their arrival at Cooper's home he

asked Cooper whether Newbegin had any cash on hand, and upon being informed that Newbegin had only a short time previously remarked to Cooper that he had some cash and would like to get hold of some business, Warfield said that was fortunate as he had some business for him; that he then telephoned Newbegin and asked him to call at the hotel the following morning; that Newbegin reached the hotel about ten o'clock in the morning, and plaintiff in error told him that he and MacFarland had an order from a responsible party living in Chicago for $22,300 worth of books, accompanied by notes aggregating that amount and a cash payment of $250, and asked him if he wanted to buy the order; that Newbegin said that he did want to buy it and would pay the usual commission of thirty per cent; that he would pay $1000 to each of them in cash, the same amount when the books were delivered and the balance when the first note was paid; that he (Warfield) then asked MacFarland to give Newbegin the order and the notes, which MacFarland had in his pocket; that Mac-Farland endorsed the notes and gave them, together with the order, to Newbegin; that the latter remarked that the order was addressed to the Keller-Farmer Company but that it did not make any difference; that MacFarland then endorsed the payment of $250 on the contract, and that he (Warfield) suggested that he strike out the name of the Keller-Farmer Company and insert the name of R. G. New-begin, which MacFarland did; that later in the day New-begin returned to the hotel and paid him and MacFarland $1000 each; that MacFarland then left, saying that he was going to Boston and would meet Warfield in New York City on the following Thursday; that MacFarland did not return until the following Saturday; that on Thursday he (Warfield) had a conversation with Cooper in which the latter told him he was going to Chicago that night to do some work for a man named Plunkett; that he (Warfield) suggested that Cooper wait and accompany them on the

following Sunday to Chicago, which Cooper agreed to do; that they arrived in Chicago on Monday morning and registered at the Auditorium Annex; that a suite of rooms was assigned to him and MacFarland but there was no vacant room near this suite, and Cooper decided to wait until some room on the same floor was vacated before having a room assigned to him; that in the meantime they suggested that Cooper leave his suit-case in their rooms, which he did; that MacFarland remained away that night and Cooper slept in his room; that on Tuesday afternoon after their arrival in Chicago, upon his return to the hotel, Cooper informed him that three men had called at the rooms to see MacFarland and that MacFarland had denied his identity to one of them; that MacFarland had gone and had left word for him (Warfield) to meet him in a cafe near by just as soon as he returned; that immediately after this conversation he heard a knock, and upon opening the door three men stepped into the room; that he did not know any of them; that one of them, who he has since learned was Joseph E. Paden, asked him whether MacFarland had returned; that he informed them that he had not, and inquired whether they were friends of MacFarland; that Paden said they were not but that they wanted to see him on business; that he (Warfield) informed them that MacFarland would not return until about half-past five o'clock; that Paden then said they were going down to the grill room and requested Warfield to inform them when MacFarland returned; that shortly afterwards MacFarland called him by telephone and asked him who the men were who had called at the room; that he informed MacFarland that one of them was Paden, an attorney, and asked him why he denied his identity; that MacFarland replied that he did not know who they were; that he then asked MacFarland why he went away from the hotel and why he did not return, and told him that those men wanted to see him; that McFarland said he would not see them until he knew

more about what they wanted; that he (Warfield) replied, "Oh, bosh! Nonsense! Come on down here to the hotel and see them;" that MacFarland then asked him to find out who they were and said he would call him up later; that he (Warfield) went down stairs and saw Paden and a man who he afterwards learned was Patten, sitting in the grill room at a table; that he stepped up to Paden, who asked him if MacFarland had returned; that he replied that he had not; that he then asked who the other gentleman was with Paden, and was told that it was Mr. Patten; that he then returned to his room, and MacFarland soon afterwards telephoned him and asked him whether he had found out who those men were; that he replied that he had,—that one of them was Patten and the other Paden and that they wanted to see him, MacFarland; that they were waiting for him in the grill room; that as one of them was Patten he had perhaps found out that his wife had bought some books and had come to see about the order; that he asked MacFarland to come to the hotel and talk to them; that MacFarland said he would not go to the hotel that night but to tell them that he would see them the next morning; that shortly afterwards he again saw Paden and Patten in the corridor of the hotel, and, addressing Patten, said that he (Warfield) thought he knew what Patten wanted to see MacFarland about, and asked him if it was not in reference to a book contract that his wife had entered into; that Patten replied that he had not told him (Warfield) his business, to which he (Warfield) responded that he thought he knew about it, and if it was what he supposed it to be, he wanted to inform him (Patten) that he (Warfield) was interested in that affair and that Patten could talk to him about it; that he asked Patten why he could not discuss the business with him—that he could represent MacFarland; that he then informed them that MacFarland would not be down that night but would be at Paden's office the next morning at ten o'clock, and that

he then left them; that he met MacFarland that night at
a drug store and asked him whether there was anything
wrong with the order he had obtained from Mrs. Patten,
and that MacFarland assured him that there was nothing
wrong with it; that he then told MacFarland that he had
agreed to have him at Paden's office the following morn-
ing at ten o'clock; that they had evidently come to see if
they could effect a compromise; that MacFarland replied
that he would not go to Paden's office; that he was not
afraid because of the order for the books, but there were
other things, and they might have him arrested; that he
argued with him for a considerable time but could not get
him to agree to meet Patten the next day; that he saw
MacFarland two or three days afterwards and again tried
to persuade him to go to Paden's office and again asked
him if there was anything wrong with that order, and that
MacFarland again assured him that the order was all right
but that there were other deals which he was afraid of;
that ten or twelve days later he went to New York; that
he met Newbegin there, and that Newbegin spoke about
the articles which had appeared in the newspapers regard-
ing the frauds that had been perpetrated on Mrs. Patten
and the fact that MacFarland was in hiding, and requested
Warfield to re-pay him the money which he had paid to
him and MacFarland, giving as a reason for the request
that he did not want to get into a lawsuit with Patten;
that thereupon he paid Newbegin $2000 and the order and
notes were thereupon turned over to him. Afterwards
Warfield attempted to compromise the matter of the en-
forcement of this contract and the collection of the notes
with attorneys representing Patten but was unable to effect
a compromise. Warfield further testified that after obtain-
ing the contract and notes he returned to Chicago and
again saw MacFarland; that he told him that he had paid
back the $2000 to Newbegin and had the contract and notes
and requested MacFarland to go with him to see Patten,

but that MacFarland again refused; that Ira Squire, one of Warfield's friends, was with him on this occasion and had brought a railroad ticket to Detroit; that when Mac-Farland refused this last time to see Patten he (Warfield) told Squire that he was through with him—to give him his ticket and let him go wherever he pleased to go; that he accompanied MacFarland to the depot and did not see him again until a short time before the indictment was returned in this case. Warfield denied that he ever dictated or signed any order for books purporting to be made by a man named Emerson and denied all knowledge of any such order. He further testified that before MacFarland left for Detroit he had on several occasions spoken to him (Warfield) about wanting to leave Chicago until this trouble had subsided, and had said that he would not stay there any longer and that while he was away Warfield and his other friends could adjust the matter. In addition to the above testimony Warfield specifically denied each and every answer given by MacFarland, while testifying in this case, which tended to show that he (Warfield) was implicated in or had any knowledge of the fraudulent transactions in which MacFarland had been engaged.

At the close of the People's case, and again at the close of all the evidence, motions were made to direct a verdict to find the defendants not guilty upon the ground that the evidence failed to show a conspiracy to obtain money or property by false pretenses, and the denial of these motions is assigned as error. The argument is advanced that the false pretenses were intended to be, and were, used to obtain Mrs. Patten's signature to an order or contract, her checks for $60 and $350, respectively, and her signature to twenty-two promissory notes, and that the conspiracy, if any, was to obtain checks, promissory notes and the signature to the contract by false pretenses, none of which are money or property within either said section 46, or section 96 of the Criminal Code, which is the section provid-

ing for the punishment of the misdemeanor of obtaining money or property by false pretenses. The word "funds" is not used in said section 46 of the Criminal Code, and its use added nothing in an indictment beyond the language in that statute. It will not be specifically treated in this opinion, but will be regarded only as it might be included in the words "money or property."

It will be seen from the testimony as detailed above, that Warfield and MacFarland were engaged in soliciting orders (or contracts, as some of the witnesses referred to them,) for books and in selling these orders to book dealers, who thereafter filled them. They ordinarily received no money directly from their customers, but received such money or commission as they afterwards contracted for, from the dealer to whom they sold the order or contract. The testimony on the part of the People tends to show that the original conspiracy between plaintiff in error and MacFarland was to procure, by means of false pretenses, the signature of Mrs. Patten to an order for the sets of books above mentioned. It does not appear from the testimony on the part of the People that at the time the conspiracy was conceived it was contemplated or intended to secure any checks or money directly from Mrs. Patten, but as the affair progressed it appears that it became a part of the conspiracy not only to procure her signature to the twenty-two promissory notes, but also to secure from her a large sum of money, or a check for as large a sum as she could be induced to give to MacFarland. It cannot be contended that the contract or the promissory notes were money, nor can it be contended that the contract and the promissory notes in the hands of Mrs. Patten were property or were of any value. It has been held that a promissory note in the hands of the maker is not property, (*Goldgart* v. *People,* 106 Ill. 25,) and it is equally true that the order or contract which Mrs. Patten was induced to execute was not property in her hands. So far as plaintiff in

error and MacFarland conspired together to procure from
Mrs. Patten this contract or order and her twenty-two
promissory notes, they were not guilty of conspiracy under
section 46 of the Criminal Code. It was their purpose, up-
on securing these papers, to sell them for such sum as they
could secure, to someone who was a dealer in *de luxe* edi-
tions of books, and it was the money of such dealer that
they were designing to secure. The evidence tends to show,
however, that it was a part of the object of the conspiracy
to secure the money of Mrs. Patten upon the representation
that it was needed to pay the expenses of MacFarland in
effecting the sale of these sets of books to the fictitious
Emerson. It is urged that the checks of Mrs. Patten were
neither money nor property and that the scheme evolved to
secure them does not constitute the crime of conspiracy.
Plaintiff in error was on trial for conspiracy and not for
the commission of the substantive crimes. The acts ac-
complished in the carrying out of the alleged conspiracy
were proper to be proven in order to assist in determining
what the conspiracy consisted of, but the existence of the
conspiracy is not necessarily affected by reason of the fact
that it was not carried out as originally planned. The of-
fense charged in this indictment was complete when the
conspiracy was formed and entered into. It is therefore
immaterial whether the alleged conspiracy actually resulted
in the obtaining of the checks, notes and contract of Mrs.
Patten instead of her money, except in so far as it tends
to throw light upon the actual object of the conspiracy.
The testimony tended to prove that it was the design of
plaintiff in error and MacFarland to secure the money of
Mrs. Patten, as was charged in the indictment.

It is insisted that the plaintiff in error was entitled to
an acquittal under the second count of the indictment, for
the reason that as the crime charged in that count was but
a conspiracy, and as the completed act,—a felony,—was
proven, the conspiracy merged in the graver offense. It is

also urged, in this connection, that the dismissal of counts 3 and 4 at the close of the case and before it had been submitted to the jury operated as an acquittal of plaintiff in error under the second count. The doctrine of merger does not apply to this case, for the reason that the proof does not show the completed crime. As has already been pointed out, the promissory notes and the contract in the hands of Mrs. Patten were not property. The checks which she gave were all made payable to the order of MacFarland, and were therefore in the same class with the promissory notes and were not property in her hands. Under the holding in *Lory* v. *People,* 229 Ill. 268, these checks were not money. It therefore follows that neither the money nor property of Mrs. Patten was actually obtained.

It is also contended that the evidence fails to show that the means intended to be used to defraud Mrs. Patten were false or bogus checks, or any other means, instruments or device commonly called the confidence game, within the meaning of the Criminal Code. It is argued that when this statute was enacted the legislature had in mind some particular device which was commonly known and referred to as the confidence game, and that without proof as to what this commonly known device was, the jury were unable to determine whether the facts shown in this case came within the designation of the confidence game. The statute is indefinite as to what constitutes the confidence game. In *Maxwell* v. *People,* 158 Ill. 248, we defined the term "confidence game" to be a swindling operation in which advantage is taken of the confidence reposed by the victim in the swindler, and that definition has since been followed and applied in numerous cases. Applying it to this case, the proof tended to show that a conspiracy had been formed to obtain the money and property of Mrs. Patten by means and use of the confidence game. It is true, as counsel for plaintiff in error suggest, that in some cases the same state of facts would constitute the crime of conspiracy to obtain

money and property by means of false pretenses and also
to obtain the same money and property by means and use
of the confidence game. The proof in this case tended to
support both the first and second counts of the indictment.

From the recital of the testimony above it will be per-
ceived that in arriving at their verdict it became necessary
for the jury to wholly disbelieve the testimony on the part
of the prosecution or that on the part of the defense, as it
is in direct conflict. It therefore became of the utmost im-
portance that neither side of the case should be prejudiced
by the improper admission of testimony or by the giving of
improper instructions to the jury.

It is contended that the court erred in admitting evi-
dence as to each and all of the frauds perpetrated upon
Mrs. Patten prior to April 30, 1908, by Drew, Rosenfield,
Adams and MacFarland. It is conceded on the part of
the plaintiff in error that these three facts were properly
received in evidence: (1) The contract between Adams
and Mrs. Patten for the Hallowell Shakespeare; (2) the
amount of money paid thereon to Adams by Mrs. Patten;
and (3) Mrs. Patten's desire to obtain sufficient money
with which to pay Adams the amount due him on April 30,
1908. The prosecution was entitled to prove by MacFar-
land all of the conversation he had with plaintiff in error
at the time the conspiracy was entered into, including his
recital of the frauds which he had already perpetrated upon
Mrs. Patten and which he recounted to plaintiff in error as
an inducement to have him engage in a further conspiracy
to defraud her. Plaintiff in error, however, had no connec-
tion whatever with the original conspiracy between Mac-
Farland and Rosenfield whereby Mrs. Patten was first de-
frauded, or with the alleged conspiracy between MacFarland
and Adams whereby she was induced finally to purchase
the Hallowell Shakespeare. While it is true that one who
enters into a conspiracy already formed ratifies all the
means employed by the other conspirators prior to the

time he entered the conspiracy, it cannot be said that this was one continuous conspiracy. Rosenfield could not be indicted and convicted for any participation in the conspiracy whereby Mrs. Patten was to be defrauded by the use of the fictitious Emerson order, nor could Adams be so convicted. It is not claimed that Rosenfield or Adams had anything to do with the alleged conspiracy entered into between MacFarland and plaintiff in error, or that they, in fact, knew anything about the existence or contemplation of any such conspiracy. No more could plaintiff in error be convicted of conspiracy with MacFarland and Rosenfield to perpetrate the first fraud upon Mrs. Patten, as he knew nothing of it and was in no way concerned. For the purposes of this prosecution it is of no consequence whatever whether Mrs. Patten was, in fact, defrauded in the Rosenfield and Adams deals, and whether she was so, in fact, defrauded can throw no light upon the question whether plaintiff in error entered into a conspiracy with MacFarland to defraud her in reference to this last transaction. The only question to be tried here was whether or not the plaintiff in error entered into this conspiracy. It was proper to show every inducement made to him by MacFarland to persuade him to enter into the conspiracy, but it was not proper to show that the statements made by MacFarland to plaintiff in error were, in fact, true. The testimony of MacFarland and Mrs. Patten as to the various frauds which had theretofore been practiced upon her by MacFarland and others, together with the various checks which she had given MacFarland during the progress of those transactions, were improperly admitted and their admission was prejudicial error. The matters in reference to the Adams contract, conceded by plaintiff in error to have been properly admitted, were competent to be proven.

It is insisted that the court erred in receiving the contract, two checks and promissory notes in evidence. For the reasons above given the checks were properly admitted

in evidence. The contract or order, and the promissory notes, were also properly admitted as evidence of acts' accomplished in the common design to secure the money of Mrs. Patten by false pretenses.

Maxine Fay testified, on behalf of the People, that she was the stenographer who wrote the fictitious Emerson order at Warfield's dictation, thus corroborating MacFarland. She testified minutely as to the contents of this instrument. Her name was not endorsed on the back of the indictment, and notice was not given the defendants of the purpose of the prosecution to call her as a witness until after the trial had begun and shortly before she was called. On receiving notice of the intention of the People to call her as a witness the attorneys for plaintiff in error endeavored to ascertain from her what she knew about the case, but she refused to give them any information, stating that she would tell them when she was placed on the stand. When she was called as a witness counsel for plaintiff in error objected to her being permitted to testify, for the reason that they had not received sufficient notice of the intention of the prosecution to use her as a witness and had been unable to learn anything about her or what she knew about the case. The court then permitted counsel for plaintiff in error to interview the witness in his chambers, and she was immediately thereafter placed upon the stand. She stated in her direct examination that she was married. The notice given counsel that the People would use this witness did not disclose whether she was married or single. On cross-examination she was asked to state her husband's name, which she refused to do, and the court then sustained an objection to the question. A series of questions were then asked her in regard to her husband and his employment, for the purpose, as counsel contend, of discovering what his relations were, if any, with the Pattens or Mr. Paden. To all of these questions the court sustained objections, and this is complained of. Under the circumstances

the cross-examination of this witness was unduly restricted. Counsel should have been permitted to disclose the relations, if any, her husband had with those interested in the prosecution of the case.

Ella McClelland was a witness for the prosecution and gave evidence tending to connect Warfield with the conspiracy. She testified that she had been engaged to Mac-Farland for a year although she knew him to be a married man, and that it had been their intention to be married when MacFarland should be able to secure a divorce from his wife. Her relations with MacFarland were permitted to be shown sufficiently to disclose what interest, if any, she may have had in sustaining his testimony. It is complained that the court erred in not permitting her to testify, on cross-examination, as to a gift of furs to her by MacFarland, as to a disagreement between them over the rental of a flat, and similar circumstances. The court did not err in this regard, as the relations between MacFarland and the witness were sufficiently shown.

Josephine Beebe, who was employed in the office of Albert Miller Adams, testified, on behalf of the People, that Adams had not been in his office in the city of Chicago since eight days before the trial began, and that she had heard from him by letter from Minneapolis, Minnesota. James Bell, a police officer, testified that on December 15, five days after the trial began, he attempted to serve a subpœna *duces tecum* upon Adams and could not find him. This testimony, which the prosecution represented was introduced for the purpose of laying the foundation for the introduction of secondary evidence as to the contents of the Adams contract, was objected to, and at the close of the People's case, no use having been attempted to be made of it as a foundation for the introduction of secondary evidence, a motion was made, and denied, to exclude it from the consideration of the jury. It was unnecessary, in any event, to make such proof as this to lay the foundation

for the introduction of secondary evidence. As no such use was attempted to be made of it, the court should have allowed the motion to exclude this evidence from the jury at the close of the People's case. It did not appear that Adams had any connection whatever with the alleged conspiracy formed between MacFarland and plaintiff in error, and if he saw fit to flee the jurisdiction of the court to evade becoming a witness in the case, that fact should not have been used to the prejudice of plaintiff in error.

The assistant State's attorney, on the cross-examination of various witnesses for the defense, asked a number of questions to which objections were promptly sustained, but complaint is made of his conduct in asking these questions and of the refusal of the court to reprimand him. As an illustration of the character of these questions, the witness Squire, a book dealer, was asked if his principal field of profits did not lie particularly in dealing with "suckers." The witness Thorne, also a book dealer, was asked if he did not tell MacFarland that if he joined the "flat-iron gang" he would surely get into trouble using the investment scheme, it having been developed that plaintiff in error at one time had an office in the Flat-iron building, in New York City. The witness Plunkett was asked if he had not sold books with the defendant Cooper upon the investment scheme. Other similar questions were asked, all of which were improper and to which the court promptly sustained objections. The conduct of the assistant State's attorney in persisting in asking questions of this character is not to be commended, and we apprehend on another trial of the case it will not be repeated.

Upon his cross-examination plaintiff in error was asked if he ever went by the name of J. J. Williams, to which he responded that he had not. He was thereupon shown a page from the register of the Plankington Hotel, of Milwaukee, dated April 8, 1908, containing the signature "J. J. Williams and wife," and was asked if the signature

was his. The witness admitted that it was. The court refused to allow the hotel register to be admitted in evidence, but also refused to exclude the testimony of plaintiff in error wherein he admitted that the signature was his. During the progress of the cross-examination repeated reference was made to this circumstance, and the plaintiff in error was asked if he had traveled under the name of Williams in other places. We do not perceive wherein the fact that plaintiff in error registered at a hotel in the city of Milwaukee under the name of Williams has any bearing whatever upon his guilt or innocence of the offense charged against him in this indictment. It has no connection whatever with this case and throws no light upon it. This evidence should have been excluded.

Complaint is made of the giving of People's instructions 1, 1*b* and 1*d*. It is conceded that these instructions are correct as abstract definitions and rules of law, and under our holding in reference to the admissibility of evidence the objections made by plaintiff in error to them have been removed, as have also the objections to People's instructions 5 and 6, which, it is insisted, were erroneous when given in connection with instructions 1, 1*b* and 1*d*, under the evidence admitted.

People's instruction 3 is as follows:

"The court instructs the jury that whoever, with intent to cheat or defraud another, designedly, by color of any false token or writing or by any false pretense, obtains the signature of any person to any written instrument or obtains from any person any money, personal property or other valuable things, is guilty of obtaining funds, money and property by means of false pretenses."

It is contended that this instruction informed the jury that "the signature of any person to any written instrument," as well as "any money, personal property or other valuable things," is funds, money and property within the false pretense statute. The plaintiff in error was indicted,

together with Cooper, for conspiracy to obtain the funds, money and property of Mrs. Patten by means of false pretenses. As has already been pointed out, the word "funds" added nothing whatever to the charge, and plaintiff in error could only be tried and convicted for a conspiracy to obtain the money or property of Mrs. Patten. While it is true that the false pretense statute provides for the punishment not only of one who by any false pretense obtains the money or property of another, but also of one who by the same means obtains the signature of any person to any written instrument or "other valuable thing," the conspiracy statute does not provide for the punishment of persons entering into a conspiracy to violate the false pretense statute except for the purpose of obtaining the money or property of another by means of false pretenses. By this instruction the jury might well have believed that they were authorized to return a verdict of guilty if they found that the object of the alleged conspiracy was to obtain the signature of Mrs. Patten to any written instrument or to obtain any valuable thing from her by means of false pretenses. The obtaining of the signature of Mrs. Patten to the order or contract and to the twenty-two promissory notes was not, as has already been pointed out, the obtaining of her money or property. It was error to give this instruction.

People's instruction 10 dealt with the law on the question of the presumption of innocence. The first paragraph of the instruction is as follows: "Everyone accused of crime is by law presumed to be innocent unless the contrary is by the evidence proved to be true beyond a reasonable doubt; and this principle should be borne in mind by you and employed during the entire proceedings herein, in connection with the introduction of all the evidence herein and each item thereof, and during your deliberations when you have retired to consider your verdict." The instruction then continues at some length with a correct statement of the law in reference to the question of the presumption of in-

nocence and was as favorable to plaintiff in error as such an instruction could properly be made. The complaint is in reference to the use of the word "unless" in that part of the instruction above quoted, it being contended that the word "until" should have been used instead. We are unable to perceive wherein there is any material difference in the use of these two words when the whole of the instruction is considered. This instruction gave a fair and correct statement to the jury of the law in reference to the doctrine of the presumption of innocence, and the court did not err in giving it.

Plaintiff in error and his co-defendant offered sixty-nine instructions. Of this number the court gave twenty-one and refused forty-eight. It is now complained that the court erred in refusing to give twenty-five of these instructions. We have repeatedly condemned the practice of burdening the trial court with passing upon such a large number of instructions. While it is true that in this case the issues were somewhat more complex and the law more involved than in the ordinary case, there was no necessity or excuse for the asking of so many instructions. By the instructions given, with the exception noted, the law of the case was substantially and correctly covered. We will not devote our time to considering or discussing defendants' refused instructions.

It is also contended that the verdict is against the weight of the evidence, and in support of this contention it is urged that Warfield's testimony is reasonable and corroborated, whereas the testimony of MacFarland is unreasonable and uncorroborated so far as Warfield's connection with the conspiracy is concerned, and that his story itself shows that he is unworthy of belief. Inasmuch as the case must go back for a new trial we refrain from discussing the weight of the evidence.

For the errors indicated in the admission of evidence and in giving People's instruction 3 the judgments of the

Appellate and criminal courts are reversed and the cause is remanded to the criminal court of Cook county for a new trial.                              *Reversed and remanded.*

Mr. JUSTICE CARTER, dissenting.