(No. 47228.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. CARL WEATHERS, Appellant.

*Opinion filed November 25, 1975.*

RYAN, J., UNDERWOOD, C.J., and WARD, J., dissenting.

James J. Doherty, Public Defender, of Chicago (Gail
A. Moreland, Assistant Public Defender, of counsel), for
appellant.

William J. Scott, Attorney General, of Springfield, and
Bernard Carey, State's Attorney, of Chicago (James B.
Zagel and Jayne A. Carr, Assistant Attorneys General, of
Chicago, and Laurence J. Bolon, John T. Theis, and
Michael J. Goggin, Assistant State's attorneys, of counsel),
for the People.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

A jury in the circuit court of Cook County found the defendant, Carl Weathers, guilty of armed robbery, and he was sentenced to imprisonment for not less than three nor more than nine years. The appellate court affirmed (23 Ill. App. 3d 907), and we granted leave to appeal.

The only issue in this court is whether the many grossly improper statements made to the jury by the Assistant State's Attorney in his rebuttal argument so impaired the fairness of the trial that the conviction must be reversed. A full statement of the evidence before the jury is essential for determination of this issue.

The victim of the armed robbery, William Crueger, testified that at approximately 11 p.m. on the evening of January 9, 1971, while he was pouring water in the radiator of his overheated car in front of 9130 South Justine in Chicago, a man approached him, pointed a revolver and said: "Give me your bread, man." Crueger took out his wallet and the robber removed approximately $50. The robber then turned and ran. Crueger testified that the street was lit with high intensity lights. He described the robber to the police as a black man, about 5 feet, 10 inches tall, 150 pounds, and wearing a dark khaki colored army parka with the hood up. He said that he told the police that "it looked like he was trying to start to grow a mustache."

Crueger was contacted by the police later that evening and went to the station. A lineup was conducted in which there were four young black men, all about the same height and all wearing winter coats. The defendant was the only one of the four wearing an army parka. Crueger identified the defendant as the man who had robbed him, and again identified the defendant during the trial.

The second witness for the State was Mrs. Doris Conners. She testified that on the night of January 9, 1971, about 10:45 p.m., as she was parking her car a few

doors from her home at 9124 South Justine, a man approached her car and said: "Miss, don't say anything. Give me your purse with your money in it." When she said that she didn't have a purse with money in it, the man stood staring for a few seconds, said "Bang," and walked across the street. She saw him approach a man working on his car across the street and went into her home and called the police. She described the assailant as a black man with a thin mustache, not much bigger than she (5 feet 7 inches, 130 lbs.) and wearing an army colored pea-jacket with the hood tied under his chin. Soon after she had given the description to the police, an officer returned to her home and asked if she would come to the station to make an identification. She agreed to do so, and as she left her home, she saw the defendant sitting in an unmarked police car with the interior light on. She identified him as the man who had approached her, and later that night she identified him again at the police station, where she also had a conversation with Crueger. Mrs. Conners identified the defendant at the trial.

The third witness for the State was Officer Ronald Spivak, who testified that after receiving descriptions from Crueger and Mrs. Conners, he arrested the defendant about a block away as he emerged from an alley. He searched the defendant, who was wearing a green army parka, but found no gun, no money, and no identification. Officer Spivak first took the defendant to Mrs. Conners's home and later to the police station for the lineup.

The State's final witness was Officer Roy Wiening; he described the procedure followed at the lineup. He also read a description of the defendant which he had prepared for a police report:

"Male, Negro; 21; height, 5'7"; 130 pounds, brown eyes; black hair, natural style; light complexion; mustache; goatee; wore gray jacket with hood; tan pants, black boots."

The defendant testified that he was presently a sophomore

in college and was employed by the Parkway Community House as a youth counseling group leader. At the time of the robbery he was unemployed, although he was working for a man in exchange for music lessons. He stated that on January 9, 1971, he went to the home of a friend, Larry Reynolds, at 9325 South Laflin. He was at Reynolds's home until approximately 10 - 10:15 p.m., at which time the two left to visit a Mr. Stewart, an acquaintance of Reynolds, who lived at 9100 South Justine. When they arrived they went straight upstairs to Stewart's room, and defendant remained at the Stewart home until 11:15 p.m. He testified that he saw Stewart's mother, and believed that his father was there, too, and that they had seen him come in and leave. The defendant also testified that he had not been arrested by Officer Spivak, but that a black police officer had arrested him and he was later put into Spivak's car. He testified that at the time he was arrested, he had both a wallet with no money in it, and a set of house keys. He stated that Mrs. Conners had identified him at the site of his arrest rather than in front of her home, and that the army parka he was wearing when he was arrested had been dyed gray and was no longer green.

In rebuttal, the State called Mrs. Joan Stewart, the mother of Mr. Stewart. She testified that on the night of January 9, 1971, when she had returned home at 10 p.m., her son and Larry Reynolds were in her home. Later that night police officers had come to the door "and said they had a fellow who they picked up and had arrested for robbery, and he claimed he was with my son." When she was asked as to the present whereabouts of her son, she answered that he "is off on a honeymoon. He just got married." She did not know where Larry Reynolds was living at the time of the trial. "He got married, too, about a month ago." She testified that the defendant had not been in her home, and that she had never seen him before.

In his closing argument, the Assistant State's Attorney, Anthony Corsentino, made the following statements.

118

He said, speaking of Mrs. Conners:

"*** Of course it is not her fault Mr. Scheffler [one of defendant's attorneys] stands up here and lies about what—

MR. GRAY: Objection.

THE COURT: The word 'lies' will go out."

And speaking of Mrs. Stewart:

"*** She was only here to tell the truth, the whole truth and nothing but the truth. He wasn't there. He told you he was there but he wasn't. Why did he lie? That is self-evident.

* * *

*** He testified he never had been arrested, and we agree he never had been arrested, and we also agree the reason he has never been arrested is because he hasn't got caught before, because he is a pretty sharp cookie as evidenced by certain facts which I will relate later.

* * *

*** He lurks in the alley like a rat. He is smart enough to get rid of everything because the police are in the alley. He made a mistake. He got rid of everything in his pocket, keys, chain, and everything else, and the money and gun.

There is snow. He is smart enough to tell you I never been arrested because he is too smart. But he got caught this time.

* * *

*** You were told during the voir dire you are to judge the defendant's case by the same standard as you judge the state's. In other words, he doesn't have to present a defense. If he does, he is subject to the same standards.

I just want you to recall his demeanor on the stand, like he put one over on you. Think of this. The defendant does not have to present a defense. He has no burden at all. The state has to prove him guilty beyond a reasonable doubt, which means, if the state doesn't sustain their burden, he automatically is not guilty. But he presented a defense. Doesn't that tell you that he knew at the conclusion of the state's case he would be proven guilty beyond a reasonable doubt? Mr. Scheffler and Mr. Gray [defendant's attorneys] knew that.

MR. GRAY: Objection.

THE COURT: I agree. That should be stricken. The jury will disregard it.

MR. CORSENTINO: They say we are trying to make criminals and perjurers out of the complaining witnesses. There is no reasonable doubt in this case. They tried to create them by confusion, indecision and misrepresentation.

MR. GRAY: Objection.

THE COURT: That will also be stricken. It is a two-way street. The jury will decide, not you people.

\* \* \*

MR. CORSENTINO: \*\*\*

Are we going to let him come in here, mingle out there. with you as if he is as innocent as the day he was born? Are we going to let him come in here and attempt to discredit citizens, get up on the stand and lie, lie, lie? I don't see how I can emphasize that too much.

MR. GRAY: Objection.

THE COURT: I agree. The jury will decide these facts.

MR. CORSENTINO: \*\*\*

I submit there are no reasonable doubts in this case that Carl Weathers is the armed robber that robbed Mr. Crueger on January 9, 1971. This court knows that Carl Weathers, as he smiles there now with a smirk on his face, committed the armed robbery.

MR. GRAY: Objection, your Honor.

THE COURT: I agree with that. I don't know that. Everybody knows that, but the jury will decide.

MR. CONSENTINO: Absolutely, your Honor. I couldn't agree more."

The appellate court held that all the statements were improper. The court stated:

"Each of the five remarks was grossly improper. We condemn them. Mr. Corsentino far exceeded the boundaries of permissible commentary. He would be well advised to remember that every defendant, regardless of the nature of the proof against him, is entitled to a fair trial [citations]. It is one thing for a prosecutor to get caught up in the heat of battle and make a

mistake. It is quite another to repeatedly transgress the bounds of decency and fair play. The law expects more and indeed demands more from one who is trained in the law and who represents the People in a criminal prosecution." (23 Ill. App. 3d at 915.)

The appellate court also held, however, that the defendant was not substantially prejudiced by the remarks because his guilt was overwhelmingly established beyond a reasonable doubt and it was "extremely unlikely" that the verdict could have been otherwise if the remarks had not been made.

We do not agree with this conclusion. It is true that there was considerable evidence against the defendant. That consideration, however, operates to present the issue, not to resolve it. Each case of this kind must be decided upon its own facts. During the course of his argument in this case, the Assistant State's Attorney charged the defendant's attorneys with lying and with attempting to create a reasonable doubt by "confusion, indecision, and misrepresentation." He charged repeatedly that the defendant lied. And as the appellate court pointed out, he told the jury that the defendant was an habitual criminal, who had not been caught before only because he was a "pretty sharp cookie," and because "he is too smart." There was no evidence to support this charge, and indeed it is undisputed that the defendant had never been arrested before. The prosecutor also told the jury that the judge knew that the defendant had committed the armed robbery, for which he was being tried, and the way in which the ensuing objection was sustained was not, in our opinion, adequate to cure the error. The prosecutor also told the jury that the fact that the defendant presented a defense showed that both the defendant and his attorneys knew, at the conclusion of the State's case, that he had been proved guilty beyond a reasonable doubt.

These were not inadvertent errors. They were severely

prejudicial, and we cannot say that they did not contribute to the defendant's conviction. The judgments are therefore reversed and the cause is remanded to the circuit court of Cook County.

*Reversed and remanded.*

MR. JUSTICE RYAN, dissenting:

While I agree that the comments of the prosecutor were improper, under the circumstances of this case they were not so prejudicial as to require that the judgment be reversed and the case remanded. The majority opinion sets forth the comments thought to be prejudicial. Yet, in reviewing them we note that without exception either the defense counsel did not object to the remarks or his objections were sustained and the comments were stricken. Failure to object to statements made in closing argument ordinarily waives any error contained in these statements. (*People v. Hampton,* 44 Ill.2d 41; *People v. Smothers,* 55 Ill.2d 172.) Also, as noted in *Hampton,* sustaining an objection to a prosecutor's comment and directing the jury to disregard it is usually sufficient to cure the alleged error.

This court stated in *People v. Smothers*:

> "The general atmosphere of the trial is observed by the trial court, and cannot be reproduced in the record on appeal. The trial court is, therefore, in a better position that a reviewing court to determine the prejudicial effect, if any, of a remark made during argument, and unless clearly an abuse of discretion, its ruling should be upheld." (55 Ill.2d 172, 176.)

The trial court in the exercise of its discretion denied the defendant's motion for a new trial. The fact that we may have ruled differently does not establish the trial court's ruling to be a clear abuse of discretion. We should not substitute our judgment based solely on our appraisal of the impact of these remarks upon the jury as revealed by the cold printed words or possibly by the emphasis that we

ourselves unconsciously supply as we read them.

Both William Crueger and Doris Conners gave accurate descriptions of the defendant to the police. Their descriptions led to an almost immediate arrest. Both witnesses positively identified the defendant soon after the arrest and at the trial. Given the strong evidence of guilt, it is difficult to perceive that the comments of the prosecutor would have altered the verdict or prejudiced the defendant's case. *People v. Pittman,* 55 Ill.2d 39; *People v. Wilson,* 51 Ill.2d 302.

UNDERWOOD, C.J., and WARD, J., join in this dissent.