THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MAURICE COLEMAN, Defendant-Appellant.

First District (5th Division)    No. 63222

Opinion filed August 5, 1977.

500

James J. Doherty, Public Defender, of Chicago (Gail Moreland, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Renee G. Goldfarb, and Michael W. Ward, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Following a jury trial defendant was found guilty of armed robbery and aggravated battery and was sentenced to serve 5 to 10 years in the penitentiary for armed robbery. On appeal he contends that: (1) he was not proved guilty beyond a reasonable doubt; and (2) a statement by the prosecutor in closing argument was prejudicial and deprived him of a fair trial. We affirm.

The following pertinent evidence was adduced at trial.

### FOR THE STATE
THE VICTIM—CHICAGO POLICE OFFICER EBBERT GENE GREENWOOD

Officer Greenwood testified that at some point between 1 a.m. and 1:30 a.m. on October 27, 1973, he entered Vern's Friendly Lounge, a tavern located at 1258 South Pulaski Road in the City of Chicago. He was off duty at that time and was dressed in a sport coat, shirt and pants. Under the sport coat he carried his snub-nosed service revolver in a shoulder holster on his left side. The revolver was loaded with six rounds of ammunition. The tavern was situated on the northwest corner of the block and he had parked his 1970 Ford Maverick in the bus stop area directly in front of the tavern. Martha Marshall had telephoned him while he was at the Continental Lounge, located at Fifth Avenue and Tripp Street in the City of Chicago, and asked him to pick her up at Vern's and take her home. After entering Vern's he saw Martha Marshall talking to a barmaid, so he ordered a drink and then went to the washroom. Previously, at the Continental Lounge, he had had something to drink but he did not recall the exact number of drinks he consumed. After leaving the washroom, he looked through the window of the tavern at his car and discovered that he had a flat tire. He informed Miss Marshall that he was going out to change the flat and suggested that she should come out when she was ready to leave. The tavern closed at 2 a.m. and it was shortly before 2 a.m. when he went out to change the tire. He went to the car, opened the trunk, took out the jack and spare, and started jacking the car up and taking the lugs off the wheel with the flat tire. During the next ten minutes the tavern closed, its customers departed and Miss Marshall came out and stood on the curb next to his car. Five or 10 minutes after

the tavern closed he suddenly heard someone come up behind him and say something which he did not understand and then a gun was put behind his right ear. He asked, "Are you the man, a policeman?" The other person said, "Yes," and he responded, "Well, I am too, my identification is in my back pocket." While he was saying this the person took his service revolver out of its holster and his identification out of his back pants pocket. He looked over his shoulder and saw the person's face. Then he heard a click behind his ear, the sound of a misfire. At this point in the trial he identified the defendant as the assailant. When he heard the misfire he was standing up by his car and after hearing it he turned to his left and began to run north on Pulaski. He ran two or three feet before he was shot twice, once in his left leg and once in his left arm. He then ran to the Fillmore Police Station, which was two blocks from the tavern, and reported that he was a police officer and that he had just been shot. A squad car took him to the University of Illinois Hospital. He remained there for three days. After he got out of the hospital, his star case, containing his identification card and star, was returned to him.

On cross-examination, the victim admitted he was not in uniform at the time of the robbery and shooting and stated that he wore nothing on the night of the incident which would indicate that he was a policeman. He further stated that Martha Marshall knew that he might be at the Continental Lounge. It was not unusual for him to be there on a Friday night or for her to call him there. However, nothing had been prearranged before he got the call from her on the night in question. The only reason he parked in the bus stop area was because he did not plan to be there long. He planned to drop Miss Marshall off at her home and then go home himself. He admitted that when he saw that the tire was flat he did not like it. He was not dressed in tire changing clothes, and having to get his jack, spare and lug wrench out, jack up the car and change the tire while Miss Marshall was waiting for him was not pleasing to him. He was perturbed. He was loosening lug nuts when the man came up to him. Miss Marshall was the only person he had thought was around at that time. He felt defendant's weapon and stood up. He did not know if defendant asked for his money. Defendant had said something; he did not understand what was said. He had his money in a clip in his right front pants pocket. Defendant pushed him across the hood of the car, took the officer's revolver, went through his coat pockets and then took the simulated leather star case from his back pants pocket. He did not mention anything about defendant going through his coat pockets before because he was not asked whether defendant did so. He turned around and saw the barrel of defendant's weapon. Then he heard the misfire. The weapon defendant had to his head was the one that misfired. He admitted that he had testified before the grand jury in January of 1974, and had related a

sequence of events different from that recounted in his trial testimony; but he stated that the sequence testified to at trial was correct. The weather on October 27, 1973, was dry and rather warm. He had never seen defendant before the incident.

On redirect examination he stated that at the grand jury hearing he responded to most of the State's Attorney's questions with either a "Yes," or a "No" answer. He further stated that he only glimpsed the barrel of defendant's weapon during the incident and he could not describe it.

MARTHA MARSHALL

Miss Marshall testified that she arrived at Vern's about 9:10 p.m. on October 26, 1973, and remained there until approximately 2 a.m. At approximately 12 p.m. she called Officer Greenwood at the Continental Lounge and asked him to pick her up at Vern's. The victim arrived at Vern's between 1 a.m. and 1:30 a.m. He was dressed in civilian clothes. He ordered a drink and then went to the men's room. After he came out of the men's room, he picked up his drink and walked to the front of the tavern. In a few moments he came back and told her he had a flat tire and said that when she was ready to leave, he would be outside changing the tire. It was very close to 2 a.m. closing time when the victim went outside to change the flat. During this period of time other patrons were leaving. She left the tavern, walked to the curb and stood behind Officer Greenwood. She noticed the flat and saw Officer Greenwood taking lugs off a wheel. A man came by, brushed into her, and headed for the officer. As he went by her she noticed that he was taking a gun out of his pocket with his right hand and that he was wearing a dark, waist-length jacket with lighter pants and a big, floppy, furry hat. She yelled to Officer Greenwood that the man had a gun. The officer started to stand up and asked, "Are you the man?" and the person said, "Yes, I am the man." The victim responded, "Well, I am the man too. My identification is in my back pocket." She saw the man take the officer's identification. Officer Greenwood was spead-eagled on the car and the man was frisking him while they were having this conversation. She had seen the assailant in Vern's earlier in the evening before the victim arrived. At this point in the trial she identified defendant as the assailant. The gun she saw defendant holding was flat looking and the back end of it stuck out over his hand. She saw defendant remove the officer's gun before he took the identification. The victim turned around and took a couple of steps; then she heard two shots and saw Officer Greenwood fall. She did not see what happened to the victim after he fell because defendant turned toward her with a gun in each hand and she was watching him. One of the guns had a cylinder and the other was flat. Defendant held the one with the cylinder in his left hand. He looked across Pulaski, then looked at her again and

then ran west on 13th Street. She screamed and banged on Vern's window in an attempt to gain entrance and call the police. Then Officer Butler arrived and they were admitted to Vern's and called the police. The police arrived and took her to Illinois Research Hospital where she saw Officer Greenwood. Thereafter she went to a police station and then she went home. Later that day detectives came to her home and she looked at photographs. The next day she went to the police station, viewed a lineup and identified defendant as the assailant. At that time he was wearing the same clothing he wore on the night of the shooting.

On cross-examination, the witness admitted that she had known Officer Greenwood for about six years prior to the incident, that she had gone out with him during that period and that they were friends. She did not have a date with him on the night in question but she had spoken to him earlier and he expected her to call him at the Continental Lounge since they had agreed that he would pick her up and drop her off at home. She regularly called and had him take her home. During the incident, Officer Greenwood was spread-eagled with his hands on the car. Defendant patted the victim down and then took the officer's revolver with his left hand. Defendant held a gun in his right hand and held Officer Greenwood's revolver in his left hand when he took the identification out of Officer Greenwood's back pants pocket with his left hand. The officer then turned to his left and started to run north—that was when the gun was fired. She admitted that she did not know which gun was fired or where the bullets struck the victim, but she heard him yell and then saw him go down. Thereafter defendant turned around and looked directly at her, making no attempt to hide his face from her. He was holding the guns so that the barrels were pointing toward her. He looked across the street, looked at her again and then ran. He did not try to take her purse or any of her personal property. She did not talk to the victim that night at the hospital and she did not visit him either at the hospital or at home while he was recovering from his wounds, but she did talk to him sometime during this recovery period. However, he did not tell her what to say at trial.

### CHICAGO POLICE OFFICER LAWRENCE BUTLER

Officer Butler testified that he had known Officer Greenwood for nine years and that he considered him to be a friend even though he did not directly socialize with him. On October 27, 1973, in the early morning hours, he was off duty and was traveling south on Pulaski in his car. His girl friend was in his car with him at that time. He was coming from the Trio Lounge which is located at Chicago Avenue and Kedzie. As he came to the intersection of 13th and Pulaski he noticed Officer Greenwood's car sitting at the northwest corner, slightly out in the street. He had ridden in that car during in-service training a few years before. He proceeded south

on Pulaski for approximately half a block, glanced into his rear view mirror and saw Officer Greenwood come up from the curb side of the parked car with both hands in the air. He also saw two other people near Officer Greenwood, one female and one male, that he did not recognize and he noticed that the male had a gun in his left hand. Officer Greenwood was facing the car, the man was positioned behind him and the female was standing close to the building. After seeing this in his rear view mirror, he stopped his car and backed up about two car lengths. He then got out of the car, grabbed his revolver and started moving around the rear of his car. At this juncture he was about a fourth of a block from the scene of the incident, facing north. The man standing behind Officer Greenwood fired the gun in his left hand twice and the victim slumped to the street. Officer Butler identified defendant as the assailant at this point in the trial. Defendant then moved west on 13th Street for almost half a block and then ran diagonally across the street into an alley. Officer Butler fired one shot in the assailant's direction and chased him until he disappeared into the alley. The officer then went back to where the victim fell but found only Martha Marshall. He knocked on Vern's door, showed his credentials to the gentleman inside, was admitted and called the police. Thereafter the officer obtained a flashlight and went out into the alley in the rear of the tavern in search of Officer Greenwood. Police cars arrived and patrolled the area for 10 or 15 minutes but could not locate the assailant. Officer Butler described defendant as wearing a big fur cap, which was either black or blue and light gray checked, a waist-length, blue, wet-look jacket and pants that were much lighter than the jacket. The day after this incident, the officer viewed a lineup with five or six men in it and identified defendant as the assailant. At that time defendant was not wearing a hat but otherwise was dressed almost the same as he was on the night of the shooting.

On cross-examination, Officer Butler stated that riding in Officer Greenwood's car to in-service training enabled him to recognize the car when he drove past it that evening. He repeated that he noticed a gun in defendant's left hand but he did not see a gun in defendant's right hand and he did not see defendant hold a gun at Officer Greenwood's head. When he first saw the victim, Officer Greenwood was facing the parked car. He saw the victim turn his head and then saw and heard the shots and saw the victim fall to the street. From the time he first saw Officer Greenwood until the time he heard and saw the shots, the victim was either coming up from the ground with his hands in the air or standing with his hands up—he did not see the victim spread-eagled over the front of the car. After Officer Greenwood fell, defendant walked at a rapid pace west on 13th Street and put the gun in the front of his trousers. Defendant started running after walking about half a block from the

scene of the incident. After the victim fell, Officer Butler did not see defendant turn and face the woman and hold two guns in front of her.

### CHICAGO POLICE OFFICER JOSEPH GIULINANO

Officer Giulinano testified that he was on duty during the late evening of October 26, 1973, and the early morning of October 27, 1973, in uniform and in a squad car with his partner. Sometime after 2 a.m. on October 27, 1973, they received a radio call and proceeded to 13th and Pulaski. Upon arriving at that location he observed what appeared to be a worn badge case lying on the street. The case was black in color and was made of leather which was fairly worn. He picked it up, opened it, and saw that it contained a star of a Chicago police officer. His supervisor told him to take the badge to the hospital where they had taken the officer. He proceeded to Illinois Research Hospital and upon arrival he was ordered to give the badge to another officer.

On cross-examination he admitted that he did not handle the badge case in such a way as to preserve any fingerprints that might be on it. Further, no one instructed him to try to preserve any fingerprints that might be on it. After he arrived at the hospital he learned that the person who had shot the victim had had possession of the badge case. Nevertheless, he did nothing to preserve any fingerprints that might have been on the star or its case after learning of this fact. He did not make out a report on his recovery of the case.

### CHICAGO POLICE TECHNICIAN JERRY RICHARDS

Officer Richards testified that he was an evidence technician on October 27, 1973, and that he was on duty in the early morning of that day. He arrived at 13th and Pulaski at 2:45 a.m. and, together with his partner, he proceeded to photograph and examine the scene. He recovered a bullet lying on the sidewalk about a foot south of the entrance to the second floor of the building housing the tavern. His partner photographed it before technician Richards picked it up and placed it in an evidence envelope. This envelope was then sealed, marked with pertinent information and initialed by both men. The car on the scene was dusted for fingerprints but none were found.

On cross-examination, he stated that he dusted the exterior of the parked car but the print impressions he found were too badly smudged to be of any value. He further stated that no one gave him a star case that night for dusting.

### CHICAGO POLICE SERGEANT DONALD SMITH

Sergeant Smith testified that he was a firearms technician in October of 1973, and that he received a sealed evidence envelope containing a .38

caliber spent bullet on October 27, 1973, and a .38-caliber revolver and four live cartridges on October 29, 1973. He examined the spent bullet and classified it as having been fired by a .38 caliber revolver with six lands and grooves in the barrel which were inclined to the left. He visually examined the revolver and noticed the name "Gene Greenwood" inscribed on the right hand side of the frame. He test fired it twice and determined that it had six lands and grooves which were inclined to the left. He compared the test bullets with the evidence bullet and concluded that the evidence bullet could have been fired from the weapon, but the evidence bullet had been so severely damaged that formation of a positive opinion was not possible. With reference to semiautomatic pistols he stated that after such a weapon fired, a cartridge case would be automatically ejected, but if such a weapon misfired, a cartridge casing would not be automatically ejected.

On cross-examination, he admitted that the only reason he could give to explain the condition of the evidence bullet was that it had struck something of a harder material than it was, and he could not tell whether it struck that material before or after it entered human flesh. He further stated that the evidence bullet was fired from a revolver, not from an automatic.

CHICAGO POLICE OFFICER IRWIN KAPLAN

Officer Kaplan testified that he was a robbery investigator in October of 1973, and that he was on duty during the early morning of October 27, 1973. He received an assignment relative to a robbery and shooting at 13th and Pulaski that morning and proceeded to the scene, arriving at approximately 2:55 a.m. There he was directed to the Illinois Research Hospital. He proceeded to the hospital and talked to Officer Greenwood. Then he proceeded to the 11th Police District Headquarters where he talked to Officer Butler and Martha Marshall. In the early morning of October 28, 1973, he and his partner went to a house located at 7025 South Bishop Street in Chicago and went up to the door. He knocked and an elderly gentleman answered the door. He identified himself as a police officer and asked the man if he could speak with Maurice Coleman. The man invited him in and directed him to a bedroom at the rear of the house. He and his partner walked into the bedroom and found a man lying in a bed. Officer Kaplan identified himself and his partner as police officers and said, "Are you Coleman? Get out of bed." Defendant arose and the officer informed defendant that he was under arrest for armed robbery. Defendant replied, "I am not Maurice. I am Sidney." Defendant was then placed under arrest. A revolver engraved with the victim's name was recovered from a drawer of a dresser next to the bed. The investigator unloaded it and recovered four rounds of ammunition.

Defendant put on a jacket and a cap. The officer recognized the cap from a description given him by one of the witnesses and took it from defendant. Later that day he conducted a lineup which was viewed by Officer Butler and Miss Marshall.

On cross-examination, the officer stated that he learned that Officer Greenwood's service revolver was missing during his investigation. He looked in the dresser to see if he could find it and he found it there. Defendant was allowed to choose the clothing he wore. The officer searched the other dresser drawers in the bedroom but no other weapon was found. The rest of the house was not searched.

On redirect examination, Officer Kaplan stated that he did not ask anyone if the entire apartment could be searched. He did not have a search warrant.

On re-cross-examination the officer admitted that he did not make any attempt to get a search warrant.

### FOR DEFENDANT

THE DEFENDANT

Defendant testified that he worked on October 27, 1973, and when he left work he went to his girl friend's house. He stayed there until about 1:30 a.m. On the way home he stopped at Vern's. The lounge was packed with 50 or 60 people when he arrived and it started closing at 1:45 a.m. He ordered a beer, drank half of it and walked outside. His friend, Lewis Bell, and some other people walked outside behind him. He stood on the corner talking, saw a man trying to fix a flat without a lug wrench and asked him if he wanted to borrow a lug wrench. Lewis Bell was laughing. The man stood up, turned around and told defendant, in effect, to leave him alone. Defendant responded with an obscene suggestion. The man then pulled a pistol from his coat pocket, put it in defendant's face and told him to mind his own business. Defendant grabbed the hand that held the pistol. The two men tussled and the gun went off. Defendant was scared and was trying to get the gun. He did get the gun from the man and the man ran south, but the gun was in the man's hand when it went off. After the struggle defendant ran west on 13th Street toward Lewis Bell's car. Bell has since died. Defendant said he did not take the gun from under the man's coat, reach in the man's back pocket and take a case, spread-eagle him across the hood of his car, or have him put his hands in the air. He denied having a gun of his own and pointing two guns at the lady standing in the corner. He got in the car with Lewis Bell and told Bell to take him home. Upon arriving at his home, he noticed the name "Greenwood" on the gun, put it in a dresser drawer, laid down, turned on the radio and heard that a policeman had been robbed and shot on 12th

and Pulaski. He did not deny that he was Maurice Coleman the next day—he told the police he was Sidney Maurice Coleman. When he was told to dress he voluntarily and of his own choice put on the same clothes that he was wearing at Vern's the night before. He tried to put on the hat he was wearing at the tavern but an officer snatched it from him. He denied shooting and robbing Officer Greenwood and denied removing two spent cartridge casings from the revolver. He left the scene because he was afraid, and no one shot at him as he was going toward Bell's car.

On cross-examination, defendant said he did not see Officer Greenwood in the tavern. The first time he saw him was outside and the first thing he said to him was to ask him if he wanted to borrow a lug wrench—the officer did not have one and was trying to take lug nuts off with a pipe of some kind. When Officer Greenwood pulled out a pistol he did not identify himself as a policeman and defendant did not know he was a policeman at that time. The officer was facing him during the struggle, the gun was in the officer's right hand and it went off twice as they were facing each other and tussling. Defendant did not know Officer Greenwood had been shot—he did not see him fall or limp while running away. After the shooting defendant ran one way and Officer Greenwood ran the other way. Defendant did not see Officer Butler at the scene. He could not explain how Officer Greenwood was shot from behind.

On redirect examination, defendant stated that he talked to his mother after he heard on the radio that a policeman had been shot. She told him to stay in the house until she could contact a lawyer. Before she could contact a lawyer he was arrested.

## For The State
### Rebuttal Witness Glen Hoversten

Glen Hoversten testified that he was a second-year surgical resident at the University of Illinois Hospital and was a doctor licensed to practice medicine in the State of Illinois. He completed his medical school training at the University of Illinois School of Medicine and had served two years of a general surgical residency at the University of Illinois Hospital. In the month of October 1973, he was that hospital's emergency room physician for surgical trauma. He was on duty when Officer Greenwood was brought in. During his examination of the victim he discovered gunshot wounds in the left upper arm and gunshot wounds in the left upper thigh. There were four punctures of the skin. The posterior wounds appeared to be entrance wounds. He explained that entrance wounds are very smooth and exit wounds show slightly more tearing of the skin and are of a larger caliber. At this juncture the following exchange occurred:

"Q. [by Assistant State's Attorney Pappas] Doctor based on your

510

examination of Officer Greenwood, can you tell us the path of the two bullets in relation to the ground as they traveled through the body?

A. The wound in the upper arm appeared to be a straight through wound, parallel to the ground, as did the wound in the upper thigh, maybe slightly downward deflection.

Q. Were you able, Doctor—strike that. Doctor, can you tell us with any reasonable degree of medical certainty as to the position of the gun in relation to the ground when it discharged?

Mr. Tuite [Defense Counsel]: Objection.

The Court: Sustained. Foundation [sic].

Mr. Tuite: That is the objection, Judge.

Mr. Pappas: Doctor, have you had occasion to examine gunshot wounds?

A. Yes.

Q. Approximately how many?

A. About 20.

Q. Now, Doctor, can you tell us with any reasonable degree of medical certainty the position of that weapon in relation to the ground when it discharged?

Mr. Tuite: Objection, foundation.

The Court: Sustained.

Mr. Pappas: Thank you, Doctor, I have no further questions."

On cross-examination, the doctor admitted that he became licensed to practice medicine approximately six months before the trial, that he graduated from medical school in 1973 and that he had not engaged in any special study of forensic pathology or of bullet wounds. He could not tell the caliber of the bullet by looking at the wounds. He had never studied the effects of ricocheted bullets. An X ray of Officer Greenwood at the time of his admission to the hospital revealed no evidence of any metal fragments within the body.

The jury found defendant guilty of armed robbery and aggravated battery and the court sentenced defendant to 5 to 10 years on the armed robbery conviction. This appeal followed.

OPINION

I.

The first issue presented on appeal is whether defendant was proved guilty of armed robbery and aggravated battery beyond a reasonable doubt. Defendant argues: (1) that the eyewitness told contradictory stories and that the victim told self-impeaching stories; (2) that the circumstances underlying the State's theory of prosecution are contrary to human experience; and (3) that Glen Hoversten was a medical student

and not an expert and there was an insufficient foundation for some of his testimony. Therefore, defendant concludes, the evidence against him is so unsatisfactory that both convictions should be reversed.

■■ In the first argument, defendant emphasizes that the versions of the incident recounted by Officer Greenwood, Miss Marshall and Officer Butler differ. He points out, for example, that these witnesses saw a different number of guns and gave different accounts of the victim's and defendant's positions at various points on the night in question. Defendant fails to take into account the fact, however, that the State's three occurrence witnesses viewed the incident from three radically different positions. Officer Greenwood was on the curb side of his car, facing the car. The defendant stood behind him. His companion, Miss Marshall, was behind both men, facing their backs. Unlike Miss Marshall, Officer Butler did not watch the entire incident. In fact, this witness had two separate observations of the incident. He first observed Officer Greenwood rising from the curb side of the parked car, hands in the air, when he glanced in his rear view mirror. Officer Butler's second observation came only after he stopped his auto, backed it up about two car lengths, parked it and exited. During this second observation he was still one-fourth to one-half block from the scene, viewing the victim, defendant and Miss Marshall from the side. From these three distinctly different vantage points the State's occurrence witnesses viewed the incident and we believe the variations in their accounts of the incident are understandable in light of this fact. We find the inconsistencies complained of to be minor in nature.

Defendant also contends in his first argument that Officer Greenwood's trial testimony differed from his grand jury testimony and thus was self-impeaching. At trial the victim testified that defendant approached him from behind and placed a gun behind his right ear. Thereafter defendant removed the officer's service revolver from his holster and then took his identification. The misfire followed. Before the grand jury, in contrast, Officer Greenwood testified that the misfire occurred before his gun was taken. The officer explained on cross-examination that the events related at trial were the same as those presented to the grand jury, but that they were presented to the grand jury in a different sequence and that the sequence presented at trial was correct. This discrepancy is minor.

■■ Defendant's second argument urges that the circumstances underlying the State's theory of prosecution are contrary to human experience. In this argument defendant first submits that the shooting could not have occurred during the commission of an armed robbery since: (1) no stickup was announced; (2) defendant did not attempt to take Miss Marshall's and Officer Greenwood's money; (3) defendant could not have seen the gun under the victim's coat and there was no other way defendant could have known the officer had a gun; (4) defendant could not have removed the badge case from Officer

Greenwood's pocket while holding two guns; (5) the robbery could not have occurred as Miss Marshall and Officer Greenwood testified it did, namely, with no one else present; (6) defendant's gun was never found and it is incredible that defendant would keep the victim's gun since it connected defendant with a crime. Defendant also submits that the shooting could not have occurred during the commission of an armed robbery as the activities of the police, including Officer Greenwood, are inconsistent with the State's robbery theory of prosecution. Defendant points to the fact that Officer Greenwood did not report a robbery upon arrival at the police station as support for this contention and as further support submits the argument that since no steps were taken to obtain fingerprints from the badge case and since only the victim's gun was found in defendant's room, the police investigation was not directed at solving an armed robbery. We do not find the circumstances underlying the State's theory of prosecution to be contrary to human experience. None of the points made by defendant in his second argument, when taken individually, lead us to the conclusion that the shooting could not have occurred during the commission of an armed robbery. Nor does the second argument in its entirety lead us to that conclusion.

It is the function of the trier of fact to draw inferences from the evidence and to determine the credibility of witnesses and the weight to be afforded their testimony, and a reviewing court should not substitute its judgments for those of the trier of fact concerning credibility, weight and inferences drawn from the evidence unless the evidence is so unsatisfactory, improbable or implausible as to justify a reasonable doubt of defendant's guilt. (See *People v. Akis* (1976), 63 Ill. 2d 296, 298, 347 N.E.2d 733; *People v. Zuniga* (1973), 53 Ill. 2d 550, 559, 293 N.E.2d 595; *People v. Givens* (1977), 46 Ill. App. 3d 1035, 1043, 361 N.E.2d 671; *People v. Hendricks* (1976), 41 Ill. App. 3d 178, 181, 353 N.E.2d 177; *People v. Henderson* (1976), 36 Ill. App. 3d 355, 368, 344 N.E.2d 239.) Accordingly, where the evidence is merely conflicting, *e.g.*, where there are minor variations or discrepancies in a witness' testimony or in the testimony of prosecution witnesses, a reviewing court will not substitute its judgments for those of the trier of fact concerning credibility, weight and inferences drawn from the evidence. (See *Akis*, 63 Ill. 2d 296, 298-99, 347 N.E.2d 733; *People v. Bell* (1972), 53 Ill. 2d 122, 125-26, 290 N.E.2d 214; *Givens; Henderson*, 36 Ill. App. 3d 355, 367-68, 344 N.E.2d 239.) Defendant's first two arguments do not persuade us that the evidence is so unsatisfactory, improbable or implausible as to justify a reasonable doubt of guilt, or tempt us to substitute our judgments concerning credibility, weight and inferences drawn from the evidence for those made by the jury in the case at bar.

■■ Defendant's third argument questions Glen Hoversten's status as

an expert and the sufficiency of the foundation for some of his testimony. With regard to Hoversten's status as an expert, defendant urges that this witness was a surgical resident who was not licensed to practice medicine at the time he treated Officer Greenwood. Furthermore, he urges that the witness was not a student of either pathology or forensic pathology and had no special knowledge of bullet wounds. Thus, defendant concludes, the witness was not an expert when he testified and, consequently, he gave incompetent medical testimony. This testimony, defendant contends, misled the jury, corroborated the State's account of the events which transpired and directly led to defendant's conviction. Since defendant did not object to the qualifications of the witness to testify as an expert, he cannot raise this issue for the first time on appeal. See *People v. Trefonas* (1956), 9 Ill. 2d 92, 98-99, 136 N.E.2d 817; *People v. Johnson* (1975), 28 Ill. App. 3d 139, 144-45, 327 N.E.2d 535.

■■ With regard to the charge that there was an inadequate foundation for some of the witness' testimony, defendant submits that there are no facts in the record to support the witness' opinion that the bullets traveled through Officer Greenwood's body on a path parallel to the ground and hence a sufficient foundation was not laid for the introduction of this opinion testimony. After this testimony was given the witness was asked about the position of the gun in relation to the ground when it discharged. This question was objected to on foundation grounds and the objection was sustained. No objection was made, however, with reference to the "path of the bullets" testimony or the question which solicited that testimony. Since defendant did not object to this testimony, it cannot be urged as error on appeal. See *People v. Killebrew* (1973), 55 Ill. 2d 337, 341, 303 N.E.2d 377; *Trefonas*.

## II

The second issue raised on appeal is whether defendant was denied a fair trial as a result of a statement made by the prosecutor during his rebuttal argument, *viz*, that defendant kept Officer Greenwood's revolver because guns are an instrument of defendant's profession.

Defendant argues that the prosecutor made this statement despite the fact that the State did not ask defendant about any prior convictions when defendant testified and therefore the statement was wholly without basis in the evidence. Defendant also argues that (1) the statement abrogated the presumption of innocence by suggesting that defendant was a habitual criminal just before the case went to the jury and when defendant could not respond to it, (2) intimations that defendant is a criminal excite a jury to convict on the ground that defendant has gone unpunished for other crimes and this statement stripped defendant of the credibility he had gained with the jury who could have agreed that the

evidence was unsatisfactory but felt that conviction was proper in order to remove one with dangerous propensities from the streets, and therefore (3) the statement was highly prejudicial and denied defendant a fair trial. Defendant adds that in other cases such an improper argument has caused reversals of convictions, *e.g.*, in *People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880; *People v. Moore* (1956), 9 Ill. 2d 224, 137 N.E.2d 246; *People v. Davis* (1936), 362 Ill. 417, 200 N.E. 334; and *People v. Thomas* (1974), 22 Ill. App. 3d 854, 318 N.E.2d 342.

While we agree that the prosecutor's statement was improper, we do not believe that the cases cited by defendant compel us to find that it constituted reversible error. In *Davis*, the prosecutor called the defendant an "abortionist" and an "abortioner," and expressed numerous additional opinions in his closing argument which indicated that the defendant was regularly engaged in the practice of performing criminal abortions. In *Moore*, the prosecutor called the defendant a "gunman" and made numerous additional improper statements in his closing argument. In *Thomas*, the prosecutor called the defendant a "criminal" before the State rested and then made improper comments in his closing argument about defendant's failure to produce alibi witnesses. In *Weathers*, the prosecutor made numerous improper statements in his rebuttal argument which included charging both the defendant and one of his attorneys with lying, and implying that defendant was a habitual criminal. There are important differences between the situations in those cases and the situation we face in the instant case. For example, in those cases numerous improper statements were made whereas here only one improper statement was made. Also, in none of the cited cases is there an indication that the improper statements made in closing argument were responses to statements made by defense counsel in his closing argument. In the instant case defense counsel stated in his closing argument:

"Why keep the gun that's going to trace him to Greenwood and throw away the gun that they say he had that isn't going to trace him. [*Sic*.] Why keep this?

If this is the proceeds of a robbery, it says Greenwood [*sic*] right on there, why keep a thing that is going to trace you to robbery, if you have another gun, and why throw away that gun?"

Thereafter the prosecutor stated in his rebuttal argument:

" * * * but I seriously doubt that he would have gotten rid of a gun. Guns, although readily available on the street, you have to pay for them and this came free of charge. This is what a man like him is after. This is what he wants to keep. This is an instrument of his profession and he would not get rid of this gun."

In our view, the prosecutor's improper statement was invited by and

made in response to defense counsel's questions. While there are numerous other differences we could point to, we believe that these two are together sufficient to distinguish defendant's cases.

■■ Moreover, whether language used by a prosecutor in his closing argument requires reversal of a conviction depends upon the facts of each case, and where the argument of defense counsel invites or provokes a response, defendant cannot complain that he was prejudiced by the response. (See *People v. Trimble* (1975), 27 Ill. App. 3d 353, 361, 326 N.E.2d 437; *People v. Kelly* (1975), 25 Ill. App. 3d 753, 757, 324 N.E.2d 82; *People v. Stewart* (1974), 24 Ill. App. 3d 605, 615, 321 N.E.2d 450; *People v. Woodley* (1965), 57 Ill. App. 2d 380, 385, 388, 206 N.E.2d 743.) As we have indicated, we believe we are faced with this situation in the case at bar. Additionally, not every ill-advised statement in a closing argument will warrant reversal of a conviction and remarks of counsel in final argument, even though improper, will not constitute reversible error unless it is reasonably clear that they influenced the jury in a manner that resulted in substantial prejudice to the defendant. (See *Kelly: Stewart*, 24 Ill. App. 3d 605, 616, 321 N.E.2d 450; *Woodley*, 57 Ill. App. 2d 380, 385, 206 N.E.2d 743.) It is not reasonably clear to us that the prosecutor's improper statement was the cause of substantial prejudice to the defendant. The statement was objected to and was stricken by the court. While we are not prepared to hold that the error inherent in the statement was thereby cured, we think it is important that the prosecutor did not repeat his transgression. In view of the totality of the evidence supporting the jury's finding of guilt, we do not believe that this single statement was a material factor in defendant's conviction and we do not believe that it caused substantial prejudice to the defendant.

In short, we hold that defendant was not denied a fair trial as a result of the statement in question.

### III

After its brief was filed the State filed a motion for leave to cite additional authority. The motion was allowed by this court. Subsequently defendant filed a motion to strike the State's motion and a memorandum in support of the motion to strike. At oral argument we informed the parties that defendant's motion to strike the State's motion would be ruled upon in our decision. We deny defendant's motion to strike the State's motion. However, because the only authority presented for our consideration in the State's motion is *People v. Scott* (1977), 45 Ill. App. 3d 487, 359 N.E.2d 878, and because that case is not pertinent to the issues raised in the instant appeal, we find it unnecessary to deal with the State's motion in this decision.

Accordingly, the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

LORENZ and MEJDA, JJ., concur.