THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
WALTER RADFORD, Defendant-Appellant.

First District (5th Division)   No. 77-1151

Opinion filed October 13, 1978.

108

Ralph Ruebner and Andrew Berman, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Joan Cherry, and Richard Heytow, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was convicted of murder (Ill. Rev. Stat. 1975, ch. 38, par. 9—1) and sentenced to 30 to 60 years in the penitentiary. On appeal, he contends that: (1) the trial court erred in allowing the State to cross-examine him regarding his prior use of alias names; (2) he was denied a fair trial by the State's unfair and prejudicial closing argument; (3) the court erred in admitting irrelevant and prejudicial photographs of the deceased; (4) the errors committed during his trial, individually and cumulatively, were not harmless; and (5) that his sentence is excessive.

The following pertinent facts were adduced at trial.

*For the State*

*Ernest Collins, Chicago Heights Police Officer*

While on patrol at approximately 12:59 p.m. on December 27, 1975, he received a report of a shooting at 332 Boston, Chicago Heights. He proceeded immediately to that address and, arriving a minute later, observed defendant exiting from the garage. Defendant told Collins that he and his wife had been "clowning," that she had a knife while he had a gun, and that the gun had gone off, accidentally hitting her. He followed defendant into the kitchen where he observed Denise Radford lying on the floor bleeding from a wound in the upper chest. Also present in the kitchen was Sharon Gardner. He placed defendant under arrest and turned him over to two other police officers who had arrived. Defendant insisted that it was cold outside and asked for his coat. Although there was a coat on the freezer in the kitchen, defendant did not take it.

Detective Martinez arrived, talked briefly to defendant outside, and came into the house. Martinez picked up defendant's coat from the freezer and found a Smith and Wesson .357 magnum revolver containing five loaded bullets and an empty .357 magnum cartridge. Examining the gun, Collins observed an empty cartridge under the firing pin, an odor of powder, and smoke on the barrel and around the cylinder. He also found a butcher knife on the floor near the victim's feet.

On cross-examination Collins admitted that defendant did not try to run from him when he arrived. Defendant was very excited and somewhat emotional, but did not appear to have been crying.

*Sharon Gardner*

She was a friend of Denise Radford and often visited at the Radford home. On December 27, 1975, at approximately 10:10 a.m. she received a phone call from defendant who told her that he did not like her and that he would kill her if she came to his house again. She then called Denise who asked her to come over. Upon arriving at the Radford home she sat at the kitchen table while Denise made coffee. Defendant entered the kitchen from the utility room after being called by Denise. He was wearing a gun on his right side. He told her, "I thought I told you not to come over here." When Denise told defendant to leave her friend alone, an argument ensued. It lasted about 15 or 20 minutes. During the argument defendant pulled the gun out and said to Denise, "I will kill you." She picked up a butcher knife, but defendant knocked it out of her hand. Denise was crying. When defendant again told her, "I will kill you," she told him to go ahead and shoot. He took a step back, "squinched" his eyes and shot her. After shooting her, defendant hollered, "Denise, oh, Denise" and said, "You saw it, it was an accident, Sharon, you saw it."

On cross-examination she admitted that she was close to Denise, but denied that she and Denise had ever been lovers. She admitted that the argument was "violent and heated" and that defendant accused her of having a lesbian relationship with Denise.

She testified that defendant held the gun in his right hand. Although she watched his movements very carefully, she admitted she did not see him cock the gun. She denied that Denise made thrusting motions with the butcher knife. Defendant used his left hand rather than the gun to knock the knife out of Denise's hand. Immediately thereafter the gun discharged. She admitted that she did not have a clear view of defendant when the gun actually discharged because Denise was blocking the view from her. After the shooting defendant said, "Oh, no" and appeared "panic .stricken."

*Dr. Tae An, a physician and forensic pathologist*

He performed an autopsy on the body of Denise Radford. The bullet entered her chest approximately three inches below the neck and

travelled backward, slightly to the right on a horizontal plane. Death was caused by the bullet lacerating the right lung.

*Lawrence Blackful*

He had known both defendant and Denise since August 1975. In November 1975 he had a conversation with defendant concerning Denise who had recently left defendant. Defendant told Blackful that he missed Denise and wanted to find her, adding that "I need her with me because she knows too much about my business." Defendant also told him that "I want her. I love her. If she comes home on her own, it will be all right. If she don't come home, man, I'm gonna have to have her knocked." He understood this to mean defendant wanted Denise killed. Defendant then wrote "one thousand" on a piece of paper and gave it to him. He told defendant that he could not help, but would try to find someone who could.

In December 1976, while he was serving a sentence in the Cook County jail for theft, he had a conversation with defendant who was also in the jail. He told defendant that he would not testify against him and agreed "to sign a statement for the lawyers." The following week he accused defendant of putting "a hit out on me in the County Jail." Defendant denied the accusation, but stated, "You're testifying against me in court," and "I thought you know better than that." In March 1977 he again saw an attorney for defendant and signed a statement, the contents of which were false. He was unable to identify the attorney who asked him to sign the statement.

On cross-examination he testified that in the statement he falsely stated that defendant had never offered him money. On redirect he stated that he had signed the false statement because he feared for his life after being threatened by defendant.

At the close of the State's case the parties stipulated that defendant was 60 years of age.

*For the Defendant*

*Ernest Collins, Chicago Heights Police Officer*

At his investigation of the shooting Sharon Gardner told him that defendant had cocked the gun as he drew it.

*Manuel Martinez, Chicago Heights Police Officer*

He responded to the shooting report, arriving at the Radford home after Collins. Defendant, after being taken into custody, told him where to find the gun.

*Defendant Walter Radford, on his own behalf*

On the morning of December 27, 1975 he left home to visit friends and returned home at approximately 10:15 a.m. or 10:30 a.m. When he arrived home he found Denise in bed with Sharon Gardner who was naked and

had her head between Denise's legs. Although he told Sharon to leave, the two women went into the kitchen. Defendant entered the kitchen and again ordered Sharon to leave, but she refused unless asked by Denise. Denise said, "Sharon don't have to go." When defendant threatened to call the police to remove Sharon, Denise ran into the bedroom where she attempted to remove a gun from a drawer, but defendant took it from her and kept it. They returned to the kitchen where the argument continued, Sharon still refusing to leave. Denise attempted to hit him with a butcher knife, saying, "I'm gonna stick it in you and run around." When Denise tried to strike him with the knife, defendant hit her hand with the handle of the gun. The gun discharged, striking Denise in the chest. He had not been aware of whether the gun was cocked or loaded. After calling for an ambulance, he attempted to help Denise. He told Sharon Gardner that it was an accident and she agreed.

Defendant testified that he always shoots a gun with the left hand because, as a result of injuries to his right thumb and right index finger, he cannot "pull the trigger with my right hand." He denied ever offering money to Lawrence Blackful or discussing Denise with him.

On cross-examination he admitted that he had used the names William Kimbrough and William Rome during the 1960's and that "a long time ago" he had also used the name Jack B. Fisher.

Denise left him for eight days following an argument on November 4, 1975, in which she cut her own ear with a knife. Ronald Walker, Denise's brother, was present during that argument.

He denied having threatened to kill Denise on December 27, 1975.

*Dr. James Thomas Hicks, a doctor of pathology and forensic medicine*

After examining X rays of the defendant he was able to determine that the last digit on the thumb of defendant's right hand was missing and that the joint on the index finger of defendant's right hand was partially destroyed. Based upon the X rays he also determined that defendant could not bend the joint in his right index finger. It was his opinion that defendant could not have cocked the gun with his right thumb nor pulled the trigger with his right index finger and that the collision of Denise's hand with the gun caused its discharge.

On cross-examination he admitted that he never personally examined defendant's finger. He further admitted that it would have been possible for defendant to learn to cock and fire the gun with his right hand despite the disabilities.

*For the State—Rebuttal*
*Ronald Walker*

He was the brother of Denise Radford. While visiting the Radford home on November 4, 1975, he observed a quarrel between his sister and

defendant. During the quarrel defendant pulled out a gun which he carried at all times and said, "I will kill you" to Denise. Defendant held the gun in his right hand. He knocked the gun out of defendant's hand. Denise and defendant then carried the argument into the bedroom. When Walker entered the bedroom a few minutes later he observed defendant on top of Denise on the bed with a steak knife in his right hand. He saw defendant stroke the knife across the left side of Denise's head and heard her say, "you cut me." He then knocked defendant off Denise, wiped off the blood and took her to the hospital.

*Manuel Martinez, Chicago Heights Police Officer*

When he asked defendant outside the house where the gun was, defendant answered, "Her gun is in the house." Martinez replied, "No, the one used in the shooting" and defendant stated, "That is hidden by the freezer area."

*Helen Gaddis*

She was a friend of Denise. Denise would sometimes stay with her in her apartment. She testified that Denise was not a lesbian during the four years she had known her. While she was visiting the Radfords approximately two weeks before Denise was shot, defendant told her, "I'm going to kill the bitch."

OPINION

Defendant first contends that the trial court erred in permitting the State to cross-examine him concerning his prior use of assumed names.

■■ It is proper for the State to question a defendant concerning his use of assumed names only where proof of such is offered into evidence and is shown to be both material and admissible. (*People v. Singer* (1919), 288 Ill. 113, 123 N.E. 327.) The fact that defendant used an assumed name should be admitted into evidence only where that fact is related to some issue in the case. (See *People v. Warfield* (1913), 261 Ill. 293, 103 N.E. 979; *People v. Pumphrey* (1977), 51 Ill. App. 3d 94, 366 N.E.2d 433.) Such evidence may encourage the jury to speculate that defendant has a prior record of crime. See *People v. Dukes* (1957), 12 Ill. 2d 334, 146 N.E.2d 14.

■■ In the present case the State on cross-examination elicited from defendant the fact that he had previously used the names William Kimbrough, William Rome and Jack B. Fisher. Defendant's use of assumed names was totally unrelated to the issues in this case and was immaterial. We, therefore, hold that the trial court erred in allowing the State to question defendant concerning his prior use of assumed names. However, we will not reverse a judgment of conviction merely because an error has been committed, unless it appears that justice has been denied or that the jury verdict may have resulted from such error. (*People*

*v. Tranowski* (1960), 20 Ill. 2d 11, 169 N.E.2d 347, *cert. denied* (1960), 364 · U.S. 923, 5 L. Ed. 2d 262, 81 S. Ct. 290.) Upon a careful review of the record we are convinced that the evidence of defendant's guilt was so overwhelming that the error complained of was harmless beyond a reasonable doubt insofar as the jury's determination of guilt is concerned.

Defendant next contends that he was deprived of a fair trial by the prejudicial closing argument of the prosecutor. We agree with defendant that certain comments made by the prosecutor were improper. First, the prosecutor improperly attempted to instruct the jury by defining "not guilty," "involuntary manslaughter" and "reasonable doubt." Secondly, he implied that defendant testified to using the .357 pistol for target practice only "after his counsel had talked to him, during the lunch break, while he was still under oath." And finally, the prosecutor alluded to defendant's sophistication and knowledge concerning our court system. However, improper remarks do not constitute reversible error unless they result in substantial prejudice to the accused. (*People v. Nilsson* (1970), 44 Ill. 2d 244, 255 N.E.2d 432, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881.) We do not believe that the improper remarks here were so prejudicial as to deny defendant a fair trial or "were so flagrant as to threaten deterioration of the judicial process." (*People v. Smothers* (1973), 55 Ill. 2d 172, 176, 302 N.E.2d 324, 326.) Furthermore, we note that defendant's immediate objections to each of these comments were promptly sustained by the trial court, thus curing the error. See *People v. Hampton* (1969), 44 Ill. 2d 41, 253 N.E.2d 385.

Defendant further contends that the trial court erred in allowing the jury to view two photographs of the deceased after the body had been removed from the scene. He argues that the photographs are gruesome, inflammatory and irrelevant to the issues involved in the trial.

"Whether a photograph of a deceased person should be admitted in evidence normally rests within the discretion of the trial court and if such a picture has sufficient probative value it may be admitted in spite of the fact that the photograph may be gruesome and inflammatory." (*People v. Lefler* (1967), 38 Ill. 2d 216, 221, 230 N.E.2d 827, 830.) Here, the trial court admitted two 8-inch by 11-inch black and white photographs of the naked body of Denise Radford apparently taken at the hospital or the morgue. The photographs demonstrate that the bullet struck the victim in the center of the chest, approximately midway between the breasts and the neck. Defendant claimed that he accidentally shot his wife as he attempted to knock a knife from her hand. Sharon Gardner, a witness for the State, testified however that defendant deliberately shot his wife immediately after threatening to do so. Evidence concerning the location of the wound is certainly relevant to the issue of whether defendant shot Denise Radford intentionally or accidentally. Although Dr. An testified as

to the location of the wound, the mere fact that there was oral testimony concerning the wound did not make the photographs unnecessarily cumulative. (*People v. Henenberg* (1973), 55 Ill. 2d 5, 302 N.E.2d 27.) Furthermore, after examining these photographs in light of the record before us, we reject defendant's contention that the gruesome and inflammatory nature of these photographs outweighs any probative value they might have. While not aesthetically pleasing, these photographs are not so gruesome or horrible as to be unnecessarily prejudicial.

Defendant also contends that the errors committed during trial, individually and cumulatively, were not harmless. We disagree. It is true that a case may be reviewed to ascertain whether an accumulation of error might have prejudiced the rights of a party. (*Oudshoorn v. Warsaw Trucking Co.* (1976), 38 Ill. App. 3d 920, 349 N.E.2d 648.) Here the only errors we have found were the introduction of defendant's prior use of assumed names and the comments of the prosecutor during closing argument. As we have previously discussed, the evidence of defendant's guilt was overwhelming. Indeed, in this appeal defendant does not challenge the sufficiency of the evidence and the jury returned the only verdict which could reasonably be returned. Considering the insubstantial nature of the accumulated error in the present case and the overwhelming evidence of defendant's guilt, we do not believe defendant suffered prejudice sufficient to warrant a reversal of his conviction.

Defendant's reliance upon *People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880, in support of this contention is misplaced. In *Weathers* the prosecutor told the jury that defendant's attorney had attempted to create a reasonable doubt by "confusion, indecision and misrepresentation," and that defendant, a habitual criminal, had not previously been caught because he was "a pretty sharp cookie." (62 Ill. 2d 114, 118-19, 338 N.E.2d 880, 882-83.) Furthermore, he told them that the court knew defendant was guilty. The supreme court held that the errors therein "were severely prejudicial, and we cannot say that they did not contribute to the defendant's conviction." (62 Ill. 2d 114, 120-21, 338 N.E.2d 880, 884.) However, in the present case we believe it clear that defendant is guilty as charged and that the errors complained of were harmless and did not contribute to defendant's conviction.

Defendant finally contends that his 30- to 60-year sentence for the murder of his wife is excessive. He argues that a 30-year minimum sentence for a 60-year-old person is tantamount to a death penalty.

Although Supreme Court Rule 615(b)(4) (Ill. Rev. Stat. 1975, ch. 110A, par. 615(b)(4)) allows reviewing courts to reduce punishments, "our decisions have firmly established that the imposition of sentence is a matter of judicial discretion and that, absent an abuse of this discretion,

the sentence of the trial court may not be altered upon review." (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 883.) A judgment as to the proper sentence to be imposed depends upon many factors, including defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. (*People v. Dukett* (1974), 56 Ill. 2d 432, 308 N.E.2d 590, *cert. denied* (1974), 419 U.S. 965, 42 L. Ed. 2d 180, 95 S. Ct. 226.) In considering whether the trial court has abused its discretion, we recognize that the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. 1, §11.

■■ The record before us reflects that over a period of 40 years the defendant has been convicted of manslaughter, forgery, theft on two occasions and tampering with an automobile. He served prison sentences for each of these convictions, being most recently released from the penitentiary in January 1973. Considering the defendant's long history of criminal activity and the nature of the offense for which he was convicted here, we do not believe the trial court abused its discretion in imposing sentence.

For the foregoing reasons the judgment of the circuit court is affirmed.

Affirmed.

MEJDA and WILSON, JJ., concur.